No. 51,414

K. L. REEVES, *Plaintiff-Appellee,* v. THE PILLSBURY COMPANY and SAFECO INSURANCE COMPANY OF AMERICA, *Defendants-Appellants.*

(625 P.2d 440)

Opinion filed March 25, 1981.

*Robert F. Duncan,* of Duncan, Senecal, Bednar & Mears, Chartered, of Atchison, argued the cause and was on the brief for the appellants.

*H. Scott Beims,* of Lewis, Lewis & Beims, of Atwood, argued the cause, and *Robert J. Lewis, Jr.,* of the same firm, was with him on the brief for the appellee.

The opinion of the court was delivered by

PRAGER, J.: This is an action filed by a farmer against the owner of a grain elevator to recover damages for conversion of wheat. The defendants, Pillsbury Company and its surety, Safeco Insurance Company of America, appeal a district court judgment holding them liable in damages for conversion of wheat belonging to the plaintiff, K. L. Reeves, which was stored by plaintiff in Pillsbury's grain elevator at Atchison. The defendants do not deny that plaintiff's grain was delivered to Pillsbury or that Pillsbury paid a third party, Brownville Grain Company, the value of the wheat. Brownville is now in bankruptcy, and both parties hope to avoid the necessity of pursuing claims against Brownville in the bankruptcy proceedings.

The facts giving rise to the dispute are not contested, and are as follows: K. L. Reeves farms wheat near Atwood in Rawlins County. In the autumn of 1975, Reeves had stored on his farm around 20,000 bushels of wheat. On October 30, 1975, he entered into a written contract with a local grain company, Brownville, for the sale of 5,000 bushels of wheat. The contract provided:

"BROWNVILLE GRAIN COMPANY
1175 S. Range
Colby, Kansas 67701
GRAIN PURCHASE CONTRACT

"Date 10-30-75

"BE IT KNOWN THAT Brownville Grain Co. (Buyer) of Box 205, 1175 South Range, Colby, Kansas 67701 (Address) HAS BOUGHT FROM K. L. Reeves (Seller) Atwood, Kansas (Address) THE FOLLOWING AMOUNT OF GRAIN 5000/bu of Wheat AT A PRICE OF 35 under K.C. spot option PER BU/CWT, SAID PRICE BASED ON #2 hrw GRAIN TO BE DELIVERED ON MUTUAL AGREEMENT BETWEEN BUYER AND SELLER:

Delivery Immediately - Payment of $3.00 ten days after delivery

Payment when seller determines price.

THE SELLER SHALL FURNISH REASONABLE MEANS TO LOAD SAID GRAIN AND SHALL BE RESPONSIBLE FOR THE LOADING OF SAID GRAIN INTO BUYER'S TRUCKS.

IN THE EVENT THE SELLER IS UNABLE TO DELIVER SAID GRAIN UNDER THIS CONTRACT DUE TO A NATURAL DISASTER, SAID CONTRACT MAY BE CANCELLED AT THE OPTION OF THE SELLER BY PAYMENT OF 5¢ PER BUSHEL TO THE BUYER.

| /s/ K. L. Reeves | /s/ Jerome G. Beery |
| SELLER | BUYER" |

There was no evidence that plaintiff and Brownville mutually agreed to the time, manner, or place of delivery, or that Brownville ever made available trucks to receive the grain upon plaintiff's tender of delivery. A Brownville employee, Mrs. Patsy Owens, testified that, normally, area farmers under Brownville contract would deliver their own grain to elevators for storage, and receive scale tickets indicating the date and quantity. The farmers then had the option of either notifying Brownville of the delivery, or waiting ten days and presenting the ticket to Brownville for payment. Notification of delivery was often made by the trucking firm delivering the grain. Upon presentation of the scale ticket, the farmer received payment for the then-determined value of the grain, and reimbursement of shipping costs.

In December, 1975, area farmers were aware of Brownville's financial difficulties. Plaintiff Reeves contracted with a neighbor, Jim Banister, for the shipment of 5,000 bushels of the 20,000 stored on his farm to Pillsbury's elevator in Atchison. Banister and Reeves both testified that the decision was made to have the scale tickets issued in Reeves's name only so that he could retain control over the wheat stored there. Banister's employee was so

instructed, and *the tickets were issued in Reeves's name only.*
Four truckloads were hauled to defendant's elevator in Atchison
on December 16, 17, and 22, 1975. Five scale tickets were issued
as receipts for the wheat. Ticket No. 44536, dated December 16,
1975, contained a checkmark in the box labelled "Contract
Number." Ticket No. 44550, dated December 22, 1975, was
originally issued to "Brownville-Brubaker," which was crossed
out and substituted with "K.L. Reeves." That ticket was also
marked "for storage," while none of the other tickets indicated
whether the delivery was "for storage" or "for sale."

Leonard Barker, a Pillsbury employee, testified regarding
ticketing procedures. He stated that the scale tickets were issued
as directed by the truck driver. If the grain was delivered pursu-
ant to a contract with either Pillsbury or another company, the
contract number was written in the designated box. If the contract
number was unknown, a checkmark was placed there. Doris
Holtgrave, grain accounting clerk for Pillsbury, testified that the
producer/ticket holder had three options. The ticket holder could
obtain a warehouse receipt for storage, sell the grain to Pillsbury,
or designate the grain to satisfy a third-party contract. If the ticket
was issued jointly to a grain company and producer, a payment
check was sent to the grain company. Producers who put only
their own names on the tickets generally collected through a grain
company, and payment was usually made to the grain company
despite the producer's name on the ticket.

On December 22, 1975, Doris Holtgrave (Pillsbury) spoke with
Patsy Owens (Brownville) by telephone concerning shipments
delivered to Pillsbury from farmers near Atwood who normally
dealt through Brownville. Reeves was not under contract with
Pillsbury, so Holtgrave asked Owens if Reeves had a contract
with Brownville. Learning that Reeves was under contract with
Brownville, Holtgrave issued checks to Brownville in payment
for the wheat received from plaintiff. No contract existed between
Pillsbury and Brownville at that time. On January 16, 1976,
plaintiff Reeves requested payment for the wheat from Pillsbury.
Pillsbury refused, claiming ownership because of payment to
Brownville, and this lawsuit ensued.

At the trial before the court and in his deposition, plaintiff
Reeves stated that he had the tickets issued in his name only so
that he could retain control of his wheat. If other farmers under

Brownville contract were paid for their wheat and Brownville appeared financially solvent, plaintiff intended to present the tickets to Brownville for payment under the contract. If Brownville became insolvent and unable to fulfill its financial obligations under the contract, Reeves intended to sell the wheat to Pillsbury or some other purchaser. At all times between the signing of the Brownville contract and Brownville's bankruptcy, plaintiff had remaining on his property over 15,000 bushels of wheat available to fulfill the Brownville contract. The trial court found that the unilateral act of Pillsbury's employee in terminating plaintiff's options as a ticketholder rendered Pillsbury liable for the wrongful conversion of plaintiff's wheat.

As basis for the assertion that the trial court erroneously determined defendant Pillsbury's liability, defendants claim that title to the 5,000 bushels of wheat vested in Brownville when the contract between Reeves and Brownville was signed, and, thus, payment to Brownville was proper. Defendants claim that the terms of the Brownville-Reeves contract are clear and unambiguous, providing for the present sale of the wheat with the immediate transfer of title upon execution. Defendants do not dispute Pillsbury's obligations as bailee or its liability for wrongful appropriation without authorization from the bailor. Plaintiff argues that the grain delivered to Pillsbury was never committed to the Brownville contract, making payment to Brownville a conversion. The parties agree Article 2 of the Kansas Uniform Commercial Code pertaining to sales is applicable.

The relevant UCC sections of the Kansas Statutes provide:

84-2-106. "(1) In this article unless the context otherwise requires 'contract' and 'agreement' are limited to those relating to the present or future sale of goods. 'Contract for sale' includes both a present sale of goods and a contract to sell goods at a future time. A 'sale' consists in the passing of title from the seller to the buyer for a price  . . . .  A 'present sale' means a sale which is accomplished by the making of the contract."

"84-2-105.  . . .  (2) *Goods must be both existing and identified before any interest in them can pass.* Goods which are not both existing and identified are 'future' goods. A purported present sale of future goods or of any interest therein operates as a contract to sell.

"(3) There may be a sale of a part interest in existing identified goods." (Emphasis supplied.)

"84-2-401.  . . .  Insofar as situations are not covered by the other provisions of this article and matters concerning title become material the following rules apply:

"(1) *Title to goods cannot pass under a contract for sale prior to their identifi-*

*cation to the contract* . . . and unless otherwise explicitly agreed the buyer acquires by their identification a special property as limited by this act. Any retention or reservation by the seller of the title (property) in goods shipped or delivered to the buyer is limited in effect to a reservation of a security interest. Subject to these provisions and to the provisions of the article on secured transactions (article 9), title to goods passes from the seller to the buyer in any manner and on any conditions explicitly agreed on by the parties.

"(2) Unless otherwise explicitly agreed title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods, despite any reservation of a security interest and even though a document of title is to be delivered at a different time or place; and in particular and despite any reservation of a security interest by the bill of lading

"(*a*) if the contract requires or authorizes the seller to send the goods to the buyer but does not require him to deliver them at destination, title passes to the buyer at the time and place of shipment; but

"(*b*) if the contract requires delivery at destination, title pàsses on tender there.

"(3) Unless otherwise explicitly agreed where delivery is to be made without moving the goods,

"(*a*) if the seller is to deliver a document of title, title passes at the time when and the place where he delivers such documents; or

"(*b*) if the goods are at time of contracting already identified and no documents are to be delivered, title passes at the time and place of contracting." (Emphasis supplied.)

Defendants claim that the Brownville-Reeves contract was a contract for the present sale of identified goods, with title vesting in Brownville upon execution. Defendants rely on K.S.A. 84-2-105(4), which provides:

"*An undivided share in an identified bulk of fungible goods is sufficiently identified to be sold although the quantity of the bulk is not determined.* Any agreed proportion of such bulk or any quantity thereof agreed upon by number, weight or other measure may to the extent of the seller's interest in the bulk be sold to the buyer who then becomes an owner in common." (Emphasis supplied.)

Comment 5 of the Official UCC Comment to 84-2-501 would also seem to support defendants' position:

"Undivided shares in an identified fungible bulk, such as grain in an elevator or oil in a storage tank, can be sold. The mere making of the contract with reference to an undivided share in an identified fungible bulk is enough . . . to effect an identification if there is no explicit agreement otherwise. The seller's duty, however, to segregate and deliver according to the contract is not affected by such an identification but is controlled by other provisions of this Article."

Defendants' argument that the wheat delivered to Pillsbury was sufficiently identified to the Brownville-Reeves contract must fail for several reasons. First, there was no reference in the

contract to an "identified fungible bulk," *i.e.* the 20,000 bushels stored on plaintiff's farm, as required by identification under 84-2-105.

Second, identification of goods to the contract requires some commitment of the goods to the buyer under the contract provisions by the seller. K.S.A. 84-2-501 discusses identification, and in pertinent part provides:

> 84-2-501. "(1) The buyer obtains a special property and an insurable interest in goods by identification of existing goods as goods to which the contract refers . . . . Such identification can be made at any time and in any manner explicitly agreed to by the parties. In the absence of explicit agreement identification occurs
>
> "(a) when the contract is made if it is for the sale of goods already existing and identified;
>
> "(b) if the contract is for the sale of future goods . . . when goods are shipped, marked or otherwise designated by the seller as goods to which the contract refers."

In reference to this provision, it is stated at 2 Anderson, Uniform Commercial Code § 2-501:4 (2d ed. 1971):

> "Identification of goods occurs when existing goods are designated or agreed upon as the goods to which the contract refers. . . .
>
> . . . .
>
> "Whether there has been an identification of goods is a question of fact.
>
> "Ordinarily identification will be made by the seller by filling an order received from the buyer. When such is the case, there is a clear manifestation of identification by the act of setting aside, packaging, or marking goods as being intended for or destined for the particular buyer. Thus it would appear that there is an identification when there is an intent to identify particular goods and some overt act manifesting that intent." pp. 60-61.

In the present case, there is nothing in the contract which specifies when identification occurs. "Explicit agreement" as to time and manner of identification may include previous usage of the trade. The usual conduct of the area farmers in performing under the terms of the form contract used by Brownville was to identify grain delivered to an elevator as relating to the contract by either (1) notifying Brownville of the delivery, or (2) presenting the scale ticket to Brownville for payment. There was no evidence that Reeves did either. Nor was there evidence indicating an intent by Reeves or overt act to identify the goods to the contract. The testimony was completely to the contrary—that he intended to retain control over the wheat, and intended to commit the wheat to the contract by presenting to Brownville the scale

ticket, only when assured that Brownville would pay him. This testimony was corroborated by the fact that the scale ticket was issued only to Reeves rather than to Brownville and Reeves jointly.

Finally, identification of the goods to the contract is only one requisite to the passing of title from the seller to the buyer. "While title to future goods cannot pass prior to their identification to the contract, the converse is not true that title must pass as soon as the goods are identified . . . ." 2 Anderson, Uniform Commercial Code § 2-401:11. It is further explained at § 2-501:4, p. 61, "that neither risk of loss nor title will pass at this time, the Code separating those problems and the rules governing them from the question of identification. Title does not pass with identification, as the seller . . . has not completed . . . his performance 'with reference to the physical delivery of the goods,' and it is at that time that title passes 'unless otherwise explicitly agreed.' " See also, Kansas comment to K.S.A. 84-2-501 (seller retains title under 2-401 until completed performance, *i.e.* physical delivery of the goods).

The rules governing passing of title are set forth in K.S.A. 84-2-401, and are applicable only in the absence of specific agreement between the parties for transfer of title. The contract in question does not specify the time or manner in which title was to pass to Brownville. Under the contract, the grain was to be delivered "on mutual agreement between buyer and seller," with buyer being responsible "for the loading of said grain into buyer's trucks." The written terms of the contract suggest title would pass at the time and place of shipment under 84-2-401(2)(*a*), or when the seller loaded the grain into the buyer's trucks. However, the time and manner of passing title, as understood by both parties to the contract, was established by prior dealings between Brownville and plaintiff, as well as Brownville and other area farmers. K.S.A. 84-1-205(1) and (2) (course of dealing and usage of trade). Both parties understood that the seller's performance was completed when the grain was delivered to an elevator for storage, and Brownville had either been notified of the delivery or the seller presented to Brownville the scale ticket for payment. See *Desbien v. Penokee Farmers Union Cooperative Association,* 220 Kan. 358, 363, 552 P.2d 917 (1976) (ambiguous contract terms construed by parties' prior conduct will be so construed, despite language suggesting another con-

struction). This would suggest passing of title upon seller presentation of the scale ticket to buyer for payment under K.S.A. 84-2-401 (3)(*a*). Support for this construction is found in K.S.A. 84-2-503 (4), which states:

"Where goods are in the possession of a bailee and are to be delivered without being moved

"(*a*) tender requires that the seller either tender a negotiable document of title covering such goods or procure acknowledgment by the bailee of the buyer's right to possession of the goods; but

"(*b*) tender to the buyer of a nonnegotiable document of title or of a written direction to the bailee to deliver is sufficient tender unless the buyer seasonably objects, and receipt by the bailee of notification of the buyer's rights fixes those rights as against the bailee and all third persons; but risk of loss of the goods and of any failure by the bailee to honor the nonnegotiable document of title or to obey the direction remains on the seller until the buyer has had a reasonable time to present the document or direction, and a refusal by the bailee to honor the document or to obey the direction defeats the tender."

See also 2 Anderson, Uniform Commercial Code § 2-503:10.

K.S.A. 84-2-401 contemplates the passing of title under a contract for the future sale of goods when the goods are identified and the seller completes performance by delivery or tender of delivery. See, 2 Anderson, Uniform Commercial Code § 2-401:15 (title to future goods will ordinarily pass when the seller does an act in satisfaction of his obligation to deliver the goods under the contract). In the present case, plaintiff neither identified the goods to the contract, nor delivered the goods as necessary for the passing of title to Brownville. Both are required for the passing of title to the buyer. Accordingly, the trial court did not err in concluding that title to the wheat remained vested in plaintiff, had not passed to Brownville under the October 30, 1975, contract, and that Pillsbury's payment to Brownville and subsequent claim of ownership rendered Pillsbury liable for conversion.

To summarize, we hold as follows: This was a bailment; Reeves is the bailor and Pillsbury is the bailee. The scale tickets were issued in Reeves's name only. Pillsbury had no authority to pay Brownville for the wheat because title never passed to Brownville. The wheat delivered by Reeves to Pillsbury was never identified as the grain covered by the Brownville contract. Reeves, as the rightful owner of the wheat, was entitled to receive payment from Pillsbury. Since Pillsbury wrongfully paid Brownville for the wheat and refused to pay Reeves, Pillsbury is liable for conversion of the wheat.

The judgment of the district court is affirmed.