**PRODUCTION CREDIT ASSOCIATION OF the MIDLANDS, Appellee,**

v.

**FARM & TOWN INDUSTRIES, INC., Appellant,**

Dale McGraw, Dorothy L. McGraw, Verle L. McGraw, Roxanne McGraw, McGraw Farms, Ken W. Stam, Constance L. Stam, Gary Williams, Farm Credit Bank of Omaha, J.I. Case Co. d/b/a Case Power & Equipment Co., J.I. Case Company, and J.I. Case Credit Corp., Defendants.

No. 93–915.

Supreme Court of Iowa.

June 22, 1994.

**340**

Richard M. LaJeunesse and Ronald L. Hansel of Hansel & LaJeunesse, Des Moines, for appellant.

Rodney P. Kubat and Jeffrey W. Courter of Whitfield & Eddy, P.L.C., Des Moines, for appellee.

Considered by HARRIS, P.J., and LARSON, NEUMAN, SNELL, and ANDREASEN, JJ.

ANDREASEN, Justice.

This appeal involves the determination of the validity of and the priority of competing

creditors' liens on a debtor's 1991 and 1992 corn crops and proceeds. The district court granted partial summary judgment in favor of the institutional lender on both claims against a grain dealer. We affirm in part and reverse in part.

I. *Background and Factual Proceedings.*

On August 10, 1990, McGraw Farms, a partnership consisting of Dale McGraw and Verle McGraw, along with Dorothy McGraw and Roxanne McGraw (collectively McGraw) entered into a loan restructure agreement with Production Credit Association of the Midlands (PCA). As part of the agreement McGraw granted PCA a security interest in "all crops now growing or hereafter planted or grown ... whether harvested or unharvested; all stored crops wherever kept; all products of crops growing, to be grown, or stored...." The security agreement extended to all proceeds and products of the described collateral. PCA filed a financing statement to perfect its security interest.

Farm & Town Industries, Inc. (FTI), a licensed grain dealer, contracted in August 1991 to buy a total of 20,000 bushels of corn then growing from McGraw. In September PCA sent written notice of its security interest in McGraw's crops to FTI. Pursuant to the contracts McGraw delivered the corn to FTI in October. FTI drafted a crop proceeds check representing payment under the contracts, jointly payable to McGraw and FTI. FTI then canceled that check and applied the proceeds to McGraw's outstanding balance. FTI later reissued a check made payable to McGraw and PCA. The check was not delivered.

On January 14, 1992, the McGraw partnership filed a petition under chapter 12 of the United States Bankruptcy Code.[1] PCA filed a motion to dismiss the bankruptcy case. In April McGraw filed a motion for authority to obtain credit or to incur debt under section 364 of the bankruptcy code. *See* 11 U.S.C. § 364(d) (1988). On May 12 the bankruptcy

---

**1.** Congress created chapter 12 bankruptcy in 1986 for the benefit of "family farmers." *See* Pub.L. No. 99–554, 100 Stat. 3105 (1986) (codified as amended at 11 U.S.C. §§ 1201–1231 (1988)). "Chapter 12 was designed to afford another avenue of reorganization for those farm debtors who had no hope of meeting the stricter adequate protection and confirmation standards of chapter 11." 9B Am.Jur.2d *Bankruptcy* § 2717, at 415 (1991).

court granted McGraw's motion and authorized FTI to extend credit to enable McGraw to produce a 1992 crop. The court's order granted FTI "a first security interest in the 1992 crop and any proceeds thereof...."

Following a June 23 hearing on PCA's motion to dismiss, the bankruptcy court dismissed McGraw's chapter 12 case. *See* 11 U.S.C. § 1208(c)(1), (9). McGraw appealed the dismissal. The dismissal order was silent on the matter of FTI's section 364(d) lien. The court later denied, on procedural grounds, two motions by FTI to expand the dismissal order to preserve its priority lien on the 1992 crop. FTI took no appeal from either ruling. McGraw's appeal of the dismissal order was later denied as untimely.

On July 6, PCA filed a petition in Iowa district court to foreclose on certain mortgages and security interests it held against McGraw. PCA sought to establish that its claims to McGraw's property were superior to all other creditors, including FTI.

PCA subsequently filed a motion for partial summary judgment against FTI asserting that its security interests in both McGraw's 1992 and 1991 crops and proceeds took priority over FTI's claims. After a hearing on the motion, the district court made a calendar entry granting summary judgment in favor of PCA on both counts. FTI then filed a motion under Iowa Rule of Civil Procedure 179(b) to alter or amend the ruling and to find that its liens on both crops took priority over PCA's interests. PCA resisted FTI's motion and also filed a rule 179(b) motion asking the court to set forth its findings of fact and conclusions of law.

Later the court issued a written decision denying FTI's motion and affirming summary judgment for PCA. The court found that (1) the bankruptcy court's dismissal of McGraw's chapter 12 case vacated FTI's security interest in the 1992 crop, and (2) PCA's interest in the 1991 crop proceeds was prior and superior to FTI's unsecured claim. FTI appeals.

On appeal FTI argues that (1) dismissal of the bankruptcy case did not vacate the court-authorized lien on McGraw's 1992 crop; (2) its security interest in the 1992 crop is enforceable and superior to PCA's security interest under Iowa law; (3) the McGraw partnership is liable for the debt incurred during the pendency of the chapter 12 case; and (4) as a buyer in the ordinary course of business it takes the 1991 proceeds free of PCA's interest. Further discussion of the facts will be detailed in the course of our analysis of the legal issues presented.

## II. *Scope of Review.*

We must determine, under the entire record, whether there is any genuine issue of material fact and whether the district court erred in its application of the law. *Stanfield v. Polk County,* 492 N.W.2d 648, 649 (Iowa 1992); Iowa R.Civ.P. 237(c). Summary judgment is proper when "the only conflict concerns the legal consequences flowing from undisputed facts...." *Stanfield,* 492 N.W.2d at 649. Matters of statutory interpretation are questions of law which we review without deference to the trial court's opinion. *American Asbestos Training Center, Ltd. v. Eastern Iowa Community College,* 463 N.W.2d 56, 58 (Iowa 1990).

We turn first to the issue of the 1992 crop liens.

## III. *1992 Crop.*

Secured transactions are governed by Article 9 of the Uniform Commercial Code (UCC). *See* Iowa Code §§ 554.9101–.9507 (1991). Priority among conflicting security interests in the same collateral is generally determined by the time of the filing or perfection. *Id.* § 554.9312(5). Here the parties initially agree that before McGraw filed its chapter 12 petition, PCA possessed a prior security interest in McGraw's 1992 crop pursuant to the terms of the August 1990 loan restructure agreement. They also agree that on May 12, 1992 the bankruptcy court granted FTI a superior lien on the same crop and proceeds.

The court's order authorized McGraw to obtain credit from FTI in the amount of $50,000 in order to procure inputs to produce the 1992 crop. When certain conditions are met section 364(d) of the bankruptcy code allows the court to "authorize the obtaining of credit or the incurring of debt secured by

a senior or equal lien on the property of the estate that is subject to a [prior] lien." 11 U.S.C. § 364(d)(1). Relying on this order FTI extended credit to McGraw and McGraw in turn executed a credit agreement, a security agreement, and an assignment of proceeds and loss payable agreement securing FTI's lien on the 1992 crop and proceeds. The security agreement provided that it was "subject to and limited by the U.S. Bankruptcy Court and Orders of the Bankruptcy Court...." FTI also filed a financing statement to perfect its security interest.

### A. Preservation of Bankruptcy Authorized Lien.

■ In its ruling denying FTI's initial motion to expand the dismissal order the court noted that "[h]ad the appeal not been filed, section 349 of Title 11 of the United States Bankruptcy Code would have applied." The bankruptcy code addresses the effect of dismissal of a bankruptcy case under section 349. *See* 11 U.S.C. § 349. Section 349(b) provides:

Unless the court, for cause, orders otherwise, a dismissal of a case other than under section 742 of this title—

(1) reinstates—

(A) any proceeding or custodianship superseded under section 543 of this title;

(B) any transfer avoided under section 522, 544, 545, 547, 548, 549, or 724(a) of this title, or preserved under section 510(c)(2), 522(i)(2), or 551 of this title; and

(C) any lien voided under section 506(d) of this title;

(2) vacates any order, judgment, or transfer ordered, under section 522(i)(1), 542, 550, or 553 of this title; and

(3) revests the property of the estate in the entity in which such property was vested immediately before the commencement of the case under this title.

*Id.* PCA and FTI disagree over the interpretation to be given to this section. Thus, the first question we must answer is whether, under section 349(b) and section 364, the dismissal of the bankruptcy case reinstated PCA's prior security interest in the 1992 crop and vacated FTI's priority lien.

■ The issue of the interaction of sections 349 and 364 appears to be one of first impression. *See generally* 2 Lawrence P. King, *Collier on Bankruptcy* ¶ 349.03, at 349-10 to 349-14 (15th ed. 1994) [hereinafter *Collier* ]. During the course of our analysis we must keep in mind that the theme underlying the federal bankruptcy code is "the equitable treatment of creditors and financial relief for over-burdened debtors." *In re Depew*, 115 B.R. 965, 969 (Bankr.N.D.Ind.1989). To this end we interpret the various provisions of the bankruptcy code as a whole and not in isolation.

The legislative history to section 349(b) states that

[t]he basic purpose of the subsection is to undo the bankruptcy case, as far as practicable, and to restore all property rights to the position in which they were found at the commencement of the case. This does not necessarily encompass undoing sales of property from the estate to a good faith purchaser. Where there is a question over the scope of the subsection, the court will make the appropriate orders to protect rights acquired in reliance on the bankruptcy case.

H.R.Rep. No. 595, 95th Cong., 1st Sess. 338 (1977); S.Rep. No. 989, 95th Cong., 2d Sess. 48-49 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 6294, 5834-35; *see also* App. 2 *Collier* Part II, at 338; App. 3 *Collier* Part V, at 48-49.

FTI contends the dismissal of the bankruptcy case did not vacate its authorized lien on McGraw's 1992 crop. In advancing its position FTI relies on subsections 349(b)(1) and (2) and interpretive case law. FTI argues that a majority of courts have held that only the enumerated code provisions are affected by a section 349(b) dismissal. *See Florida Peach Corp. v. Commissioner of Internal Revenue*, 90 T.C. 678, 683-84, 1988 WL 31439 (1988); *Depew*, 115 B.R. at 971-72; *United States v. Standard State Bank*, 91 B.R. 874, 878-79 (Bankr.W.D.Mo.1988), *aff'd*, 905 F.2d 185, 187 (8th Cir.1990); *In re Newton*, 64 B.R. 790, 793 (Bankr.C.D.Ill. 1986); *Norton v. Hoxie State Bank*, 61 B.R.

258, 260 (Bankr.D.Kan.1986); *In re BSL Operating Corp.,* 57 B.R. 945, 952 (Bankr. S.D.N.Y.1986).

While PCA concedes court orders to obtain credit or to incur debt under section 364 of the bankruptcy code are not referenced under subsection 349(b)(1) or (2), it argues that subsection 349(b)(3) specifically provides for the reinstatement of prebankruptcy property rights. *See In re Lawson,* 156 B.R. 43, 45 (9th Cir. B.A.P.1993); *In re Ethington,* 150 B.R. 48, 49 (Bankr.D. Idaho 1993); *In re Kucera,* 123 B.R. 852, 854–55 (Bankr.D.Neb. 1990); *In re Groves,* 27 B.R. 866, 868 (Bankr. D.Kan.1983). We note in passing that security interests are property rights protected by the Fifth Amendment of the federal Constitution. *See United States v. Security Indus. Bank,* 459 U.S. 70, 75–78, 103 S.Ct. 407, 411–12, 74 L.Ed.2d 235, 240–42 (1982). PCA asserts that unless the bankruptcy court exercises its broad authority to protect the rights of the parties, the complete undoing of the bankruptcy case is appropriate here because this case was dismissed *prior* to the confirmation of a reorganization plan. *Compare Kucera,* 123 B.R. at 854–55 (dismissal without a confirmed plan returns the parties to their prebankruptcy positions) *with Depew,* 115 B.R. at 972–74 (postconfirmation dismissal does not revoke the obligations as set forth in the confirmed plan).

Upon reviewing the purposes behind the applicable code provisions and the significance of a confirmed reorganization plan, the court in *Depew* concluded that "[t]o construe an order of dismissal as also vacating the order of confirmation would severely undermine the effect that Congress gave to confirmation of a plan and the need to give finality to the act of confirmation." 115 B.R. at 971. The court also noted that upon confirmation of a plan the bankruptcy estate ceases to exist and all remaining property is vested in the debtor. *See* 11 U.S.C. § 1141(b). Once a plan is confirmed there is no longer any property of the estate as to which section 349(b)(3) could operate. *See Depew,* 115 B.R. at 972; *Standard State Bank,* 91 B.R. at 878–79.

■ Additionally, PCA points out that section 364 of the bankruptcy code does not preserve a subsection 364(d) lien upon dismissal of a case. Instead, subsection 364(e) provides that

[t]he reversal or modification on appeal of an authorization under this section to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e); *see, e.g., Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting,* 908 F.2d 1351, 1355 (7th Cir.1990). Express mention of one thing in a statute generally implies the exclusion of others. *State ex rel. Miller v. Santa Rosa Sales & Mktg., Inc.,* 475 N.W.2d 210, 218 (Iowa 1991); *Barnes v. Iowa Dep't of Transp.,* 385 N.W.2d 260, 263 (Iowa 1986).

■ We agree with PCA that absent a confirmed chapter 12 plan at the time of dismissal or a court order protecting any rights acquired in reliance on the bankruptcy case, subsection 349(b)(3) "basically restores parties to the position they would have had if the bankruptcy case had not been filed." *Kucera,* 123 B.R. at 854. Several considerations support this result.

Significantly, section 364(e) does not preserve a section 364(d) order upon dismissal of a case. Our interpretation of the statutes is also consistent with the stated legislative purpose behind section 349 that the bankruptcy case is to be undone "as far as practicable." *See Kucera,* 123 B.R. at 854–55. Moreover, we can identify no federal interest that would preclude application of subsection 349(b)(3) to reinstate suspended property rights following a preconfirmation dismissal of a chapter 12 case. *See, e.g., Kucera,* 123 B.R. at 855; *Depew,* 115 B.R. at 972–73.

We hold that upon dismissal of McGraw's case subsection 349(b)(3) effectively reinstated PCA's prior security interest in the 1992 crop. Because the bankruptcy court failed to order otherwise, we also hold that the priori-

ty status of FTI's lien under bankruptcy law was not preserved. This conclusion, however, does not resolve the question of the validity of FTI's security interest under state law.

### B. Application of State Law.

■ PCA argued, and the district court agreed, that state law was not relevant because the bankruptcy dismissal completely voided FTI's security interest. Thus, PCA did not address the relative priorities of the security interests under state law.

A leading authority on bankruptcy law comments on the relevance of state law in this context:

> The most difficult question for the parties to the transaction, and particularly the non-debtor party, is to determine the extent to which normal, i.e., non-bankruptcy, documentation practices should be followed. If, for example, the lien authorized under section 364(c) is one which, absent bankruptcy, must be perfected by recording to be valid or prior against competing interests, such action should not be necessary as long as the bankruptcy proceeding is extant.... What, however, would the result be if the case is dismissed? Unless the court for cause orders otherwise, under section 349(b)(3), dismissal revests property of the estate in the entity in which the property was vested immediately before the commencement of the case. While the dismissal should be conditioned upon protection of the rights of parties ... this may be scant protection after the case has been dismissed.... [T]he better practice is for the lender to fully document its loan and to comply with applicable non-bankruptcy recording statutes.

2 *Collier* ¶ 364.04, at 364–11 to 364–12. We believe that under these circumstances it would be inequitable to deprive a secured creditor of an interest otherwise enforceable under state law. *See Kucera,* 123 B.R. at 855. Therefore, we must determine the rights as between these competing creditors under Iowa commercial law.

### C. Iowa Code Section 554.9312(2).

We find the record clear that FTI fully complied with statutory requirements for fil-ing and perfection of its security interest in the 1992 crop. Although PCA's security interest was perfected much earlier, FTI claims that its lien takes priority under Iowa Code section 554.9312(2).

Under Article 9 of the UCC, purchase-money security interests generally take priority over conflicting security interests in the same collateral. *See* Iowa Code § 554.-9312(3), (4). Loans for the purchase of seed and other supplies for crop production are forms of purchase-money financing. Crop loans are treated differently from purchase-money loans. *Id.* § 554.9312(2). Section 554.9312(2) provides:

> A perfected security interest in crops for new value given to enable the debtor to produce the crops during the production season and given not more than three months before the crops become growing crops by planting or otherwise takes priority over an earlier perfected security interest to the extent that such earlier interest secures obligations due more than six months before the crops become growing crops ..., even though the person giving new value had knowledge of the earlier security interest.

Like other purchase-money provisions, we believe this statute must be applied to "maximize the protection given to the creditor who is actually financing the production of the [current] crop." *In re Bossingham,* 49 B.R. 345, 352 (Bankr.S.D.Iowa 1985).

It is undisputed that FTI extended $50,000 credit in May of 1992 making it possible for McGraw to produce a 1992 crop. FTI's security interest was for new value and was given within three months of planting. *See, e.g., Bossingham,* 49 B.R. at 351; *McCoy v. Steffen,* 227 Neb. 72, 416 N.W.2d 16, 18 (1987).

Over the years PCA made a number of loans to McGraw. On September 1, 1991, McGraw failed to pay an installment of $43,-046.85 due under several notes and the 1990 loan agreement. McGraw also failed to pay an installment due on October 1 of $45,-119.62. Because McGraw failed to cure the default PCA declared the entire obligation due in December.

The term "due" in section 554.9312(2) has been interpreted as overdue. *See Salem Nat'l Bank v. Smith,* 890 F.2d 22, 23–24 (7th Cir.1989); 13 Neil E. Harl, *Agricultural Law* § 118.02[3], at 118–38 to 118–39 (1993). Applying this provision we find that two of McGraw's installments to PCA were due more than six months before the 1992 crop was planted. *Salem Nat'l Bank,* 890 F.2d at 24 (crop production lender has priority to the extent that installment payments are overdue). Therefore, under section 554.9312(2) FTI's purchase-money security interest in the 1992 crop takes priority over PCA's security interest.

### D. Partnership Law.

PCA raises another argument concerning the validity of FTI's security interest. PCA contends FTI's security interest is unenforceable against McGraw because the act of filing the bankruptcy petition automatically dissolved the partnership. *See, e.g., In re Phillips,* 966 F.2d 926, 931–32 (5th Cir.1992). PCA claims that once a debtor becomes a debtor-in-possession in a bankruptcy proceeding it is a separate entity and no longer possesses the authority to bind the partnership with postpetition transactions. *See generally* Iowa Code §§ 544.30, .31(5), .33, .35 (dissolution and winding up under Uniform Partnership Act) (now codified at Iowa Code chapter 486 (1993)). *But see* 9 Am.Jur.2d *Bankruptcy* § 342, at 354 (1991) (A debtor-in-possession "may be considered to be an entity distinct from the debtor with regard to actions occurring prior to the filing of the bankruptcy petition.").

FTI cites *In re Safren,* 65 B.R. 566, 570–72 (Bankr.C.D.Cal.1986), to support its claim that McGraw remained liable for debts incurred during the pendency of the bankruptcy case. The court in *Safren* determined that the filing of a reorganization case was distinguishable from a liquidation case and did not automatically dissolve a general partnership, as opposed to a limited partnership, under the Uniform Partnership Act. *Id.* at 569–72.

However, we need not decide whether McGraw's postbankruptcy transaction is binding upon the partnership entity following the preconfirmation dismissal. Pursuant to the bankruptcy court's section 364(d) order, McGraw's obligations to FTI were also guaranteed by the individuals involved. Both of the McGraw partners and their spouses signed the credit agreement, security agreement, and financing statement in their individual capacities.

Consequently, we hold that FTI's security interest is an enforceable property right under Iowa law and FTI's lien on the 1992 crop or proceeds thereof has priority to the extent of the $50,000 credit extended for new value.

## IV. *1991 Crop.*

### A. Buyer in Ordinary Course of Business.

■ With regard to the 1991 crop proceeds FTI contends that it is a buyer in the ordinary course of business and that this status entitles it to the proceeds free of PCA's prior perfected security interest. *See* Iowa Code § 554.9307(4)(a). PCA argues that FTI is not a buyer in the ordinary course of business because it attempted to apply the crop proceeds check in partial satisfaction of McGraw's pre-existing debt.

Pursuant to grain contracts executed in August 1991, McGraw delivered its corn crop to FTI in October. On December 16 FTI issued a check for $30,528.88, jointly payable to McGraw and FTI. That same day FTI canceled the first check and applied the entire amount to McGraw's accounts receivable balance. Because legal action was pending, FTI later reversed the credit to McGraw's account and issued a check on January 6, 1992, jointly payable to McGraw and PCA. The check was not delivered and the proceeds remain in FTI's possession.

A "buyer in ordinary course of business" means

a person who in good faith and without knowledge that the sale to that person is in violation of ownership rights or security interest of a third party in the goods buys in ordinary course from a person in the business of selling goods of that kind.... "Buying" may be for cash or by exchange of other property or on secured or unsecured credit and includes receiving goods or documents of title under a pre-existing

contract for sale but does not include ... security for or in total satisfaction of a money debt.

Iowa Code § 554.1201(9). Iowa Code section 554.9307(1) elevates the rights of qualified buyers of goods over the rights of secured creditors "even though the security interest is perfected and even though the buyer knows of its existence." Subsection 554.-9307(4)(a) provides:

A buyer in the ordinary course of business buying farm products from a debtor engaged in farming operations takes subject to a security interest created by the debtor, if within one year before the sale of the farm products the buyer receives prior written notice of the security interest which complies with this subsection and the buyer fails to perform the payment obligations specified in the notice.

Applying these provisions we have held that "buying" does not include transfers to the extent they are in satisfaction of an antecedent debt. *First State Bank v. Shirley Ag Serv., Inc.,* 417 N.W.2d 448, 455–56 (Iowa 1987); *accord Linn Coop. Oil Co. v. Norwest Bank of Marion,* 444 N.W.2d 497, 498–99 (Iowa 1989). The status of a buyer in ordinary course extends "only to those giving new value in exchange for collateral." *Shirley Ag Serv.,* 417 N.W.2d at 455. To hold otherwise would permit an unsecured creditor or a creditor with a junior lien "to bootstrap himself into priority over a creditor with an otherwise superior secured interest." *Id.*

Here, FTI did not pay either McGraw or PCA for the 1991 crop; it attempted to apply the proceeds to McGraw's pre-existing debt after receiving written notice of PCA's security interest. Apparently FTI is arguing that because it reissued the proceeds check there was no actual transfer in partial satisfaction of an antecedent debt and therefore it is a "buyer in ordinary course of business." However, FTI offers no reason as to why it is entitled to the proceeds check other than to satisfy a portion of McGraw's outstanding debt. We therefore conclude FTI is not a buyer in ordinary course as to any portion of the proceeds.

**B.  Present Sale.**

■  Even assuming FTI is a buyer in the ordinary course of business, PCA claims FTI is not protected by subsection 554.9307(4)(a) because the "sale" of corn occurred after FTI received the required notice of its security interest in McGraw's crop. *See* Iowa Code § 554.9307(4)(a) (buyer must receive written notice within one year before the sale of farm products). FTI contends that the contracts represented "present sales" of crops then growing; thus the sales occurred prior to PCA's notice. *Id.* §§ 554.2106(1), .2107(2). PCA counters that a sale does not occur until title passes to the buyer and title usually passes at the time of the delivery of the goods. *Id.* §§ 554.2106(1), .2401(1), (2). Under this record PCA is correct.

In August 1991 McGraw executed two grain contracts with FTI. The first contract provided that McGraw Farms "has this day contracted and sold 5000 bushels of corn ... to be delivered October 91." The second contract was for 15,000 bushels, also for October delivery. The contracts consisted of one page preprinted forms where the parties filled in most of the blanks with the terms and signed at the bottom of the page. Payment would be made after delivery. On September 12 FTI received written notice of PCA's security interest in McGraw's crops. The corn was delivered on three occasions in October.

Article 2 of the UCC is controlling on this issue. *See id.* §§ 554.2101–.2725 (sales of goods). Under section 554.2106(1) a contract for the sale of goods

includes both a present sale of goods and a contract to sell goods at a future time. A "sale" consists in the passing of title from the seller to the buyer for a price (section 554.2401). A "present sale" means a sale which is accomplished by the making of a contract.

Further, title to goods cannot pass until the goods are both existing and identified. *Id.* §§ 554.2105(2), .2401(1), .2501(1). "Unless otherwise explicitly agreed title passes to the buyer at the time and place at which the seller completes the seller's performance with reference to the physical delivery of the

goods...." *Id.* § 554.2401(2). Therefore, a present sale of growing crops can be made by identification of the particular goods as goods to which the contract refers *and* by *either* delivery of the goods *or* by an express agreement that title will pass at the time the contract is executed.

 A present sale of goods by contract is often used where nonmovable goods are involved. *See, e.g., Lubecki v. Omega Logging, Inc.,* 674 F.Supp. 501, 506–07 (W.D.Pa. 1987) (title to standing timber passed when contract was made because parties intended severance to begin immediately); *Groth v. Stillson,* 174 N.W.2d 596, 598 (Mich.App. 1969) (same). The intent to effectuate a present sale must be expressly stated in the contract. Iowa Code § 554.2401(1), (2); *see, e.g., Cullipher v. Lindsey Rice Mill, Inc.,* 730 F.Supp. 970, 972 (W.D.Ark.1990) ("The undersigned seller of the grain indicated on this contract fully understands that he or she is transferring title of said grain to the buyer and is relinquishing all control of the grain to the buyer."). We find "no evidence of this requisite intent except the rather plain and usual terms of the invoice...." *Crocker Nat'l Bank v. Ideco Div. of Dresser Indus., Inc.,* 660 F.Supp. 186, 190 (S.D.Tex.1987).

Further, there is no language in the contracts identifying the corn to be sold or even describing the land upon which the crops are growing. Iowa Code § 554.2501(1); *see also In re Sunriver Farms, Inc.,* 27 B.R. 655, 664 (Bankr.D.Or.1982). Even fungible goods must be identified as a portion of an identified bulk of fungible goods. Iowa Code § 554.2105(4); *see also Reeves v. Pillsbury Co.,* 229 Kan. 423, 625 P.2d 440, 445 (1981). We conclude FTI's grain contracts failed to satisfy either requirement of a present sale. Thus, FTI received notice of PCA's security interest before the sale occurred.

The court therefore correctly concluded that section 554.9307(4)(a) did not permit FTI to take the 1991 crop proceeds free of PCA's security interest.

V. *Disposition.*

We hold that the bankruptcy court's dismissal of McGraw's chapter 12 case did not void FTI's security interest in McGraw's 1992 crop under state law. Under Iowa Code section 554.9312(2) FTI's security interest takes priority over PCA's interest in the 1992 proceeds. We also hold that PCA's security interest in the 1991 crop proceeds takes priority over FTI's claim under section 554.9307(4)(a) because FTI was not a buyer in the ordinary course and FTI received notice of PCA's interest before the sale occurred.

Accordingly, we affirm the court's grant of partial summary judgment concerning the 1991 proceeds but reverse as to the 1992 proceeds.

**JUDGMENT AND RULING AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.**