**TOP OF IOWA COOPERATIVE, an Iowa Corporation, Appellee,**

v.

**SIME FARMS, INC., Appellant.**

No. 98–1166.

Supreme Court of Iowa.

March 22, 2000.

Glenn L. Norris, George F. Davison, and David N. May of Hawkins & Norris, Des Moines, for appellant.

Richard K. Updegraff, Sean P. Moore, and Miranda L. Hughes of Brown, Winick, Graves, Gross, Baskerville, and Schoenebaum, P.L.C., Des Moines, for appellee.

**TERNUS, Justice.**

The appellee, Top of Iowa Cooperative, sued the appellant, Sime Farms, Inc., for damages arising out of Sime Farms' failure to deliver corn under four hedge-to-arrive (HTA) contracts. Sime Farms claimed that the contracts were illegal and that, in any event, the Coop had repudiated the contract by making an unreasonable demand for assurances. A jury found in favor of the Coop and awarded damages against Sime Farms. We affirm.

## I. *Background Facts and Proceedings.*

**A.** *Hedge-to-arrive contracts.* Before we discuss the particular facts of this case, it is helpful to briefly review the nature of HTA contracts. "[I]n a basic HTA contract, a farmer and grain elevator enter into a contract that contemplates delivery of a specified quantity of grain at a fixed point in time in the future." *Andersons, Inc. v. Horton Farms, Inc.,* 166 F.3d 308, 319 (6th Cir.1998). In a typical HTA contract, the elevator sets the price it is willing to pay based on the open market price on the Chicago Board of Trade (CBOT) for the delivery period, minus what is known as the basis.[1] (The basis is simply the elevator's cost of doing business, such as transportation costs, storage, labor, and utilities, plus a profit.) Upon entering into an HTA contract, the elevator hedges its purchase by simultaneously selling a futures contract on the CBOT, thereby protecting itself from any change in the cash price of corn at the date of delivery.

Although the transaction up to this point is relatively straightforward, there are several complicating factors. First, grain elevators must conduct their trading on the CBOT through licensed brokers. When

1. In the Midwest, the market price for grain such as corn is set on the open market established by the CBOT. During trading hours on the CBOT, contracts are bought and sold for the future delivery of corn in the months of December, March, May, July, and September. Contracts bought and sold on the CBOT are known as "futures contracts." The price established by the CBOT for the buying and selling of grain is widely disseminated to the public.

the price of corn on the futures market rises, the contract with the broker typically requires the elevator to pay what is known as "margin money"—the difference between the original futures contract price and the current futures price—in order to maintain its futures position.[2] The elevator recovers the margin money when it sells the corn delivered by the farmer at a higher cash price.[3] Of course, if the farmer does not deliver, the elevator has no grain to sell, and it cannot recover its margin. Thus, the elevator's hedged position remains risk-free only so long as the farmer can be counted upon to deliver the grain specified under the contract.

In addition, HTA contracts prevalent in the 1990's had two features that distinguished them from traditional grain contracts where the parties agreed on a fixed price for a specified future delivery date. In HTA contracts, the basis was not set at the time of contracting. Rather, the farmer was allowed to choose when to set the basis, provided it was done within the time period specified in the contract. This contract term introduced an element of speculation into the contract, because an elevator's basis generally fluctuated. Consequently, a farmer who delayed setting the basis was open to the risk that the elevator's basis would increase, there-

by lowering the price the farmer would receive for his grain.

The second element of risk in HTA contracts is introduced when the farmer is allowed to postpone delivery to a later date. This practice is known as rolling. When the price of grain rises by or near the time set for delivery, the farmer may prefer to sell his grain on the current cash market for a higher price rather than deliver the grain to the elevator for the contract price. Under these circumstances, the parties may agree to modify the contract by delaying, or rolling, the delivery date to a date in the future. To preserve its hedged position, the elevator buys back, at the current price, the futures contract it had previously sold on the CBOT and enters into another futures contract to sell grain on the new delivery date.

The complicating factor in rolling is that the price of corn for the new date of delivery generally is not the same as the current price for the old delivery date. This difference is called the spread. If the new price is higher, the spread is positive and will result in a gain or carry. If the new price is lower, however, it will result in a loss or inverse. This gain or loss is fixed at the time of the roll and is added to or deducted from the new contract price under the rolled HTA contract. Thus, when the farmer decides to roll, he can

**2.** The requirement of margin payments arises from the nature of futures contracts. One court has explained these contracts in the following manner:

Parties who enter futures contracts do not agree to pay the price that prevails when they buy the contracts; they agree to pay the price that prevails when the contracts expire (or the positions are closed by offsetting transactions). A contract for September corn, entered into in March, will fluctuate in price until September, when its final price is determined by the price of the cash commodity at the delivery point.

*Nagel v. ADM Investor Servs., Inc.,* 65 F.Supp.2d 740, 753 (N.D.Ill.1999).

**3.** An example will illustrate how hedging works and how it protects the elevator from any price risk. We will make the following assumptions. The Coop contracts to pur-

chase 20,000 bushels of corn from Sime Farms for a December 1995 delivery date. The CBOT price for December 1995 corn is $2.49 at the time of contracting, so Sime Farms is entitled to receive $2.49 minus the basis upon delivery. The Coop hedges this transaction by selling a futures contract on the CBOT at the same price of $2.49. In the months leading to December 1995, the price of December corn rises to $3.00. As the price rises, the broker requires the Coop to pay a total of $ .51 (margin money) to preserve its futures position. Sime Farms delivers the corn in December 1995, as agreed. The Coop pays Sime Farms $2.49 less the basis, which the Coop retains. As noted, the price of December corn is $3.00. The Coop then sells the delivered corn for $3.00, thereby netting $.51 and recovering its margin money. Thus, both parties end up with the proceeds they bargained for in the original contract.

458 ■

determine at that time whether he will incur a gain or loss. The problematic risk arises when the farmer rolls to a month when he will not have grain on hand to deliver. He has then exposed himself to an additional, unknown risk because he will have to roll again before he will be able to make the agreed-upon delivery. If the market deteriorates and the price of corn falls, the farmer may ultimately be required to deliver grain at a significant loss.

Unfortunately, this predicament is precisely the situation that faced Sime Farms in the summer of 1996, which brings us to the facts of this case. In recounting the facts, we view them in a light most favorable to upholding the jury's verdict. *See Lawrence v. Grinde*, 534 N.W.2d 414, 418 (Iowa 1995).

B. *Factual background.* Top of Iowa Cooperative is a farmer-owned cooperative that operates in several locations, including Lake Mills, Iowa. Prior to January 1995, the Lake Mills location was owned and operated as the Farmers Coop Elevator Company of Lake Mills. Sime Farms, Inc. is an Iowa corporation wholly owned by Mark Sime. As its name suggests, its business is farming. Sime Farms is a member of the Coop, and for many years prior to the time in question, did nearly all of its grain and agronomy business with the Coop's predecessor, Farmers Coop Elevator Company. (In the remainder of this opinion, we refer to both entities as the Coop.)

In the fall of 1994 and the spring of 1995, Sime Farms entered into three HTA contracts with the Coop. These contracts called for the delivery of a total of 40,000 bushels of corn in December 1995. This grain represented Sime Farms' entire annual corn production. One month before delivery was due under these contracts, Sime Farms contracted to sell an additional 20,000 bushels of corn for delivery in May 1996. The Coop hedged each contract by selling futures contracts on the CBOT for corresponding delivery dates.

In November 1995, Sime Farms rolled its December 1995 delivery dates to March 1996. Although the HTA contracts did not specifically address the ability of Sime Farms to roll, the contracts contemplated this possibility by providing for a fee of one cent per bushel for each roll. Handwritten modifications were made on the contracts indicating the new delivery dates. The contract price was also adjusted to reflect the spread between the current December 1995 futures price and the March 1996 futures price. This adjustment was a positive six cents, a seven-cent carry minus the one-cent roll fee. Sime Farms then sold its 1995 crop on the cash market at a price significantly higher than the December 1995 futures price it had contracted to receive under the original HTA contracts.

Although the roll to March 1996 resulted in a gain or carry, the parties were aware at the time of this roll that a roll to July 1996 or December 1996 would result in a significant inverse, or loss. The parties also knew that Sime Farms would have to roll again into at least December 1996 because it had no grain to deliver until it harvested its 1996 crop.

In February 1996, the contracts were rolled to May 1996. This roll resulted in a gain of slightly less than three cents per bushel, which was added to the contract price. In April 1996, all four contracts were rolled to July 1996. This roll resulted in a thirteen-cent-per-bushel loss or inverse, and so this amount was deducted from the price the Coop agreed to pay Sime Farms for July delivery. By late April 1996, the inverse between July 1996 and December 1996 was around $1.30 per bushel. Because Sime Farms had no corn to deliver in July 1996, it was faced with the prospect of rolling into December 1996 at a significant loss, or breaching its contracts with the Coop. If Sime Farms breached the contracts, the Coop would have to repurchase the offsetting futures it

held on the CBOT, resulting in a loss of the margin money it had paid.

By May 1996, the Coop was becoming increasingly concerned about farmers' abilities and willingness to perform on the outstanding HTA contracts. The Coop's manager, Paul Nesler, spoke with Mark Sime at least once in May regarding the inverse situation and the effect of rolling into December. Sime told Nesler that he would get back to the Coop about what he planned to do, but he never did. The Coop's concerns were heightened even further when, that same month, the Iowa Attorney General's office announced that some of the HTA contracts might be "illegal."

On June 6, 1996, the Coop sent a letter to Sime Farms and similarly-situated producers in which the Coop stated that "[i]n response to recent market and non-market developments," the Coop wanted to confirm that its customers holding HTA contracts were capable of and intended to perform. The Coop stated it would consider compliance with the following two conditions as adequate assurance of Sime Farms' ability and willingness to perform: (1) payment in full of all commissions and margins previously paid by the Coop, or a binding letter of credit obligating an institutional lender to pay such commissions and margins; and (2) the return of a signed copy of the Coop's letter agreeing to delivery of the agreed-upon quantity of grain on or before the delivery dates set forth in the contracts. Finally, the Coop stated that a failure to provide the requested assurances would constitute a repudiation of the contract.

The next day Mark Sime came to the Coop to discuss the letter. Nesler informed Sime that Sime Farms could roll its contracts to December 1996 and would not be required to reimburse the Coop for the margin calls already paid. Nesler also told Sime that the Coop would consider a buy-out of the contracts by Sime Farms over a period of time at a low interest rate. Nesler called Sime a few days later to find

out what Sime wanted to do. Sime told Nesler that the Coop would be receiving a letter from Sime Farms' lawyer.

The Coop did in fact receive a letter from Sime Farms' attorney later that day. In this letter Sime Farms took the position that the Coop's demand for assurances was an attempt to change the terms of the HTA contracts and that the Coop had no grounds to do so. Sime Farms also asserted the illegality of the contracts under the Commodity Exchange Act, 7 U.S.C. §§ 1–25. Sime Farms' attorney closed his letter by informing the Coop that Sime Farms did "not intend to deliver at a price which includes the losses your elevator agreed to assume in the contract relating to unfavorable margins." Upon receipt of this letter, the Coop terminated the futures positions it held in reliance on the Sime Farms HTA contracts. Sime Farms did not deliver grain under any of the contracts. This lawsuit followed.

C. *Course of the litigation.* The Coop claimed in this lawsuit that Sime Farms breached its contracts with the Coop by failing to give adequate assurances upon the Coop's reasonable demand for such assurances. *See* Iowa Code § 554.2609 (1995) (providing that party's· failure to provide adequate assurance after a justified demand is a repudiation of the contract). Sime Farms asserted several counterclaims, including a request for a declaratory judgment that the contracts were illegal and unenforceable under the Commodity Exchange Act. Sime Farms also claimed as an affirmative defense that the Coop breached the contracts by making an unwarranted and unreasonable demand for assurances.

The case proceeded to trial. At the close of the evidence, Sime Farms moved for a directed verdict, asserting (1) the Coop did not have reasonable grounds for insecurity as a matter of law, (2) the Coop, by insisting on new terms, materially breached the contract, thereby relieving Sime Farms of its obligation to perform,

and (3) the contracts were illegal. The district court denied Sime Farms' motion, ruling that the HTA contracts were legal and that the Coop had generated factual questions on the other issues. The jury was then instructed on the Coop's breach of contract claim. It was told that the contract could be breached in one of three ways: (1) a failure to perform; (2) a repudiation of the contract; and (3) a failure to give adequate assurances upon a reasonable demand for such assurances. The court also instructed the jury on Sime Farms' affirmative defense that its performance was excused by the Coop's alleged repudiation of the contract. The jury returned a general verdict in favor of the Coop and awarded damages in the amount of $118,125.

Upon entry of judgment by the court, Sime Farms moved for judgment notwithstanding the verdict and for new trial. In support of these motions, Sime Farms argued, among other things, that the court could not consider parol or extrinsic evidence of conversations between the parties that would change or modify the Coop's written demand for assurances. The trial court denied the defendant's motions.

## II. *Issues on Appeal.*

Sime Farms raises four issues on appeal. First, it asserts that the district court erred in holding the HTA contracts were legal. Second, it claims that the Coop, as a matter of law, did not have reasonable grounds to be insecure concerning Sime Farms' performance of the contracts. Third, Sime Farms contends that the Coop's demand for assurances amounted to a repudiation as a matter of law, thereby excusing Sime Farms from performing. Sime Farms' final assignment of error is the trial court's admission of parol evidence with respect to the Coop's written demand for assurances.

The Coop has filed a cross-appeal urging us to consider an alleged error by the trial court in the event we rule that the Coop repudiated the contracts as a matter of

law. In that circumstance, the Coop claims the trial court erred in failing to give the Coop's requested instruction on retraction of the demand for assurances.

Because we find no basis to reverse the judgment in favor of the Coop, we do not reach the issue raised in the cross-appeal. We now address the issues raised by Sime Farms in its appeal.

## III. *Legality of the HTA Contracts.*

■ A. *Scope of review.* Whether the contracts at issue in this case are illegal under the Commodity Exchange Act (CEA) is a matter of statutory interpretation. Therefore, our review is for the correction of errors of law. *See State v. Canas,* 571 N.W.2d 20, 22 (Iowa 1997). Although we give respectful consideration to the decisions of federal district courts and federal courts of appeals on this issue, we have the authority to decide this case based on our own interpretation of federal law. *See ASARCO Inc. v. Kadish,* 490 U.S. 605, 617, 109 S.Ct. 2037, 2045, 104 L.Ed.2d 696, 715 (1989); *Iowa Nat'l Bank v. Stewart,* 214 Iowa 1229, 1246, 232 N.W. 445, 454 (1930).

■ B. *General principles.* The primary goal in interpreting a statute is to ascertain the enacting body's intent. *See State v. Casey's Gen. Stores, Inc.,* 587 N.W.2d 599, 601 (Iowa 1998). We begin with an examination of the language of the statute. *See id.* We look not only to the words used by Congress, but also to the context within which they appear. *See id.* The legislative history of the statute is also helpful in determining Congress's purpose in enacting a particular provision. *See Henriksen v. Younglove Constr.,* 540 N.W.2d 254, 256–57 (Iowa 1995). Once we have determined Congress's intent, we interpret the statute so as to give effect to the purpose underlying the legislation. *See DeLaMater v. Marion Civil Serv. Comm'n,* 554 N.W.2d 875, 878 (Iowa 1996).

C. *Discussion of congressional intent.* The CEA makes it "unlawful . . . to enter

into ... any transaction in ... a contract for the purchase or sale of a commodity for future delivery" unless, among other requirements, the transaction is conducted on a board of trade designated by the Commodity Futures Trading Commission. 7 U.S.C. § 6(a). The Act specifically excludes from the term "future delivery" "any sale of any cash commodity for deferred shipment or delivery." *Id.* § 1a(11). Although the Act does not use labels to distinguish between contracts falling within the Act and those falling within the exclusion, courts and commentators have generally categorized contracts that must be transacted on a board of trade as "futures contracts" and contracts falling within the exception as "cash forward contracts." *See, e.g., Grain Land Coop v. Kar Kim Farms, Inc.,* 199 F.3d 983, 990–91 & n.15 (8th Cir.1999); *Commodity Futures Trading Comm'n v. Noble Metals Int'l, Inc.,* 67 F.3d 766, 772 n.4 (9th Cir.1995); *Commodity Futures Trading Comm'n v. Co Petro Mktg. Group,* 680 F.2d 573, 576 (9th Cir.1982) (citing H.R.Rep. No. 93–975, at 129–30, U.S.Code Cong. & Admin.News 1974, p. 5843 (1974)). There is no dispute that unless the HTA contracts between Sime Farms and the Coop fall within the cash-forward-contract exception, they would violate the Act because they were not transacted on a board of trade. Consequently, we focus our analysis on the exception.

In examining the cash-forward-contract exclusion, we have found the exclusion's legislative history to be most enlightening on the issue of congressional intent. The Ninth Circuit Court of Appeals reviewed the legislative history of this exclusion in the *Co Petro* case. As the court noted there, "[t]he exclusion for cash forward

contracts originated in the Future[s] Trading Act" enacted in 1921.[4]  680 F.2d at 577. The Futures Trading Act was passed in response to excessive speculation and price manipulation in grain futures markets. *See id.* To prevent such abuses, the Act imposed a prohibitive tax on all futures contracts with two exceptions: (1) "future delivery contracts made by owners and growers of grain, owners and renters of land on which grain was grown, and associations of such persons"; and (2) "future delivery contracts made by or through members of boards of trade which had been designated by the Secretary of Agriculture as contract markets." *Id.* Significantly, during hearings on this bill, concern was expressed that the exemption of owners, growers and renters was too narrow and that a variety of legitimate commercial transactions, such as cash grain contracts between farmers and grain elevators for future delivery of grain, should also be exempt. *See id.* (citing Hearings on H.R. 5676 Before the Senate Committee on Agriculture and Forestry, 67 Cong., 1st Sess. 8–9, 213–14, 431, 462 (1921)). As a result of this concern, "any sale of cash grain for deferred delivery" was excluded from the term "future delivery." *See id.* (citing S.Rep. No. 67–212, at 1 (1921)). One senator stated during the hearings on this bill that the legislation did

> not concern itself at all with the sale or purchase of actual grain, either for present or future delivery. The entire business of buying and selling the actual grain, sometimes called "cash" or "spot" business, is expressly excluded. It deals only with the "future" or "pit" transaction in which the transfer of actual grain is not contemplated.

---

4. The Futures Trading Act was declared unconstitutional. *See Hill v. Wallace,* 259 U.S. 44, 68, 42 S.Ct. 453, 458, 66 L.Ed. 822, 830 (1922) (holding Act unconstitutional as an impermissible exercise of Congress's taxing power). In response, Congress passed the Grain Futures Act, eliminating the taxing provision and simply regulating contracts for the future delivery of grain pursuant to its author-

ity to regulate commerce. *See Co Petro,* 680 F.2d at 578 n.7. With respect to the portions of the Futures Trading Act relevant to our discussion here, there were no material changes in the Grain Futures Act, which was the precursor to the present Commodity Exchange Act. *See id.* (citing H.R.Rep. No. 67–1095, at 3 (1922)).

*See id.* at 578 n.6 (quoting 61 Cong. Rec. 4762 (Aug. 9, 1921)).

In 1936, when Congress enacted the CEA, it reworded the exclusion to except "any cash commodity for deferred shipment or delivery." *See id.* (quoting Commodity Exchange Act, Pub.L. No. 74–675, § 2, 49 Stat. 1491 (1936)). Congress also deleted the express exemption for owners and growers as redundant. *See id.* (citing H.R. Rep. No. 74–421, at 4–5 (1935)). In a 1974 House Report on amendments to the CEA, the retained exemption was described as involving, for example, a farmer who wants to convert 5000 bushels of wheat into cash and so sells it to the elevator for a guaranteed price but with a deferred delivery date. *See id.* (citing H.R.Rep. No. 93–975, at 129–30 (1974)).

■ In view of the legislative history of the exclusion, the court in *Co Petro* concluded that a cash forward contract exempt from the Act "is one in which the parties contemplate physical transfer of the actual commodity." *Id.; accord Salomon Forex, Inc. v. Tauber,* 8 F.3d 966, 970 (4th Cir.1993) (" '[F]utures' regulated by the Act do not include transactions involving actual physical delivery of the commodity, even on a deferred basis."). This conclusion is similar to that reached by the Commodity Futures Trading Commission in drawing a distinction between futures contracts and cash forward contracts:

> Commodity futures transactions involve standardized contracts for the purchase or sale of commodities which provide for future, as opposed to immediate, delivery, and which are directly or indirectly offered to the general public and generally secured by earnest money, or "margin." They are entered into *primarily* for the purpose of assuming or shifting the risk of change in value of commodities, *rather than for transferring ownership of the actual commodities....*
>
> ... [T]he "cash commodity" exclusion was intended to cover only contracts for sale which are entered into with the expectation that delivery of the actual commodity will eventually occur through performance on the contracts. The seller would necessarily have the ability to deliver and the buyer would have the ability to accept delivery in fulfillment of the contract. Although the desire to acquire or dispose of a physical commodity is the underlying motivation for acquiring such a contract, delivery may be deferred for purposes of convenience or necessity.
>
> Thus, a major difference between an excluded cash commodity-deferred delivery contract and contracts of sale of a commodity for future delivery is that the former entails not only the legal obligation to perform, but also the generally fulfilled expectation that the contract will lead to the exchange of commodities for money. In contrast, parties to a futures contract do not usually expect delivery and it rarely occurs.

*In re Stovall,* [1977–1980 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 20,941, at 23,778 (C.F.T.C. Dec. 6, 1979) (emphasis added) (citations omitted); *accord Salomon Forex,* 8 F.3d at 971 (noting that futures contracts are "standardized and transferable" and "seldom result in physical delivery of the subject commodity").

■ A similar rationale distinguishing cash forward contracts from futures contracts was recently adopted by the Eighth Circuit Court of Appeals: "[I]t is the contemplation of physical delivery of the subject commodity that is the hallmark of an unregulated cash-forward contract." *Kar Kim Farms,* 199 F.3d at 990. In determining whether the parties contemplated physical delivery in that case, the court "examined the intentions of the parties, the terms of the contract, the course of dealing between the parties, and any other relevant factors." *Id.* at 991. Other factors it considered relevant included

> whether the parties are in the business of obtaining or producing the subject commodity; whether they are capable of delivering or receiving the commodity in

the quantities provided for in the contract; whether there is a definite date of delivery; whether the agreement explicitly requires actual delivery, as opposed to allowing the delivery obligation to be rolled indefinitely; whether payment takes place only upon delivery; and whether the contract's terms are individualized, rather than standardized.

*Id.*

It is helpful to briefly examine the court of appeals' analysis leading to its conclusion that the HTA contracts involved in the *Kar Kim Farms* case were excluded transactions. The contracts required the producer "to deliver at an unspecified time a fixed quantity and grade of grain" to the cooperative. *Id.* at 987. The price was determined by reference to the CBOT price for March 1996 corn, minus the variable component known as basis. *Id.* The farmer was allowed to choose when to set the basis so long as it was done within the time frame specified in the contract. *Id.* The contract specifically provided that the cooperative would hedge the transaction by selling an equal amount of grain on the CBOT. *Id.* The cooperative was responsible for any margins or commissions paid on the hedge. *Id.* The contract allowed the producer to roll, or postpone, delivery to a later date for a per-bushel fee of two cents. *Id.* When a producer rolled his contract, the cooperative also rolled its hedge. *Id.* Any gain or loss incurred by the cooperative in rolling its hedge was added to or subtracted from the CBOT futures price referenced in the contract between the producer and the cooperative. *Id.* The contract also contained a cancellation provision allowing the producer to cancel the contract for five cents per bushel plus or minus the accumulated spread. *Id.* Finally, the contract provided that the producer must deliver grain in order to be paid any gains. *Id.*

In evaluating this contract, the court concluded that actual delivery of the grain was contemplated for several reasons: (1) the cooperative was in the business of buying grain for resale; (2) the cooperative entered into HTA contracts only with grain farmers and producers, not the general public; (3) the other party to the contract was a producer in the business of growing and selling grain; (4) the contract terms were individually negotiated, unlike standardized futures contracts; (5) the producer did not engage in an offsetting transaction; and (6) the producer was not required to guarantee his performance by the payment of margins. *Id.* at 991–92. The fact that the producer could roll the contracts did not detract from the court's conclusion because the producer's "ability to roll the contracts merely allowed him to delay his delivery obligation rather than avoid it altogether." *Id.* at 992; *accord Andersons,* 166 F.3d at· 321 n.20 ("[T]he mere possibility of infinite rolling is not dispositive; whether actual delivery is contemplated remains the focal point."); *Oeltjenbrun v. CSA Investors, Inc.,* 3 F.Supp.2d 1024, 1040 (N.D.Iowa 1998) (same). Not even the contract's cancellation provision was viewed by the court as sufficient to transform the HTA contract into a futures contract subject to the Act. *Kar Kim Farms,* 199 F.3d at 992. The court rejected the producer's contention that "HTA's can only fall within the cash-forward exception if [the] obligations of the parties to make or to accept delivery are inescapable," concluding instead that the congressional policy underlying the exemption merely required "'a legitimate expectation that physical delivery of the actual commodity by the seller to the original contracting buyer will occur in the future.'" *Id.* (quoting *Andersons,* 166 F.3d at 318).

■ D. *Sime Farms' arguments re interpretation of the exclusion.* Before we turn to an application of the law to the facts of this case, we address Sime Farms' argument that the foregoing authorities should be rejected in favor of an interpretation of the exemption consistent with the law of sales under the Uniform Commercial Code (U.C.C.). Sime Farms focuses

on the language of the exemption excluding "any *sale* of any cash commodity for deferred shipment or delivery." 7 U.S.C. § 1a(11) (emphasis added). Under the U.C.C., "[a] 'sale' consists in the passing of title from the seller to the buyer for a price." Iowa Code § 554.2106(1). The U.C.C. further provides that "[g]oods must be both existing and identified before any interest in them can pass." *Id.* § 554.2105(2). Based on these principles, Sime Farms argues that only contracts dealing in "existing and identified" grain would qualify as cash forward contracts under the Commodity Exchange Act exemption.

We reject this argument for several reasons. First, as already noted, to qualify as a sale under the U.C.C., title must pass. In the case of grain, however, title does not generally pass until the grain is delivered. *See Production Credit Ass'n v. Farm & Town Indus., Inc.,* 518 N.W.2d 339, 346–47 (Iowa 1994) (citing Iowa Code § 554.2401(2)). The requirement of actual delivery can, however, be avoided by "an express agreement that title will pass at the time the contract is executed." *Id.* at 347. If we were to apply this law, the exclusion for cash forward contracts would be effectively eliminated. *See generally* Edward M. Mansfield, *Textualism Gone Astray: A Reply to Norris, Davison, and May on Hedge to Arrive Contracts,* 47 Drake L.Rev. 745, 749 (1999). It is exceedingly unlikely that grain elevators or cooperatives would agree to take title to growing crops, and therefore assume the risk of loss of the undelivered grain. *See id.* In addition, as one court has noted, "[t]he relevant statutory language came into existence long before the U.C.C. [and] … serves a different function from identification to the contract under the U.C.C." *Nagel v. ADM Investor Servs., Inc.,* 65 F.Supp.2d 740, 755 (N.D.Ill.1999) (rejecting argument that the word "sale" as used in the federal exemption should be given the same meaning as "sale" under the U.C.C.). Finally, we agree with the Eighth Circuit Court of Appeals that appli-

cation of the U.C.C. definition of "sale" is inconsistent with the congressional policies underlying the CEA. *See Haren v. Conrad Coop.,* 198 F.3d 683, 684 (8th Cir.1999).

In an attempt to undermine the persuasiveness of the authorities discussed in the preceding section of our opinion, Sime Farms also relies on a guidance statement made in an interpretive letter issued by the Commission. *See* CFTC Interpretive Letter No. 96–41, [1994–1996 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 26,691, at 43,852 (May 15, 1996). In this letter, the Commission sets forth a "statement of guidance regarding certain contracting practices," and lists characteristics of contracts that the Division of Economic Analysis would construe as falling within the forward contract exclusion. *Id.* In general, these characteristics describe a contract that contemplates delivery within a single crop year. *Id.* We note that the Commission clearly expresses in its interpretive letter that it is not taking a position on the legality of any individual contract. *Id.* at 43,849. Moreover, its discussion that delivery should occur within the same crop year as harvest is merely the view of the Division of Economic Analysis with respect to "prudent risk-reduction." *Id.* at 43,852. Even if this guidance statement were interpreted as the Commission's view of the legality of certain HTA contracts, "nowhere in the statutory language of the CEA is there a restriction [on the exemption] to deferment of delivery within a single crop year." *Oeltjenbrun,* 3 F.Supp.2d at 1043. For these reasons, we do not find the Commission's letter helpful in deciding whether the contracts before us fall within the exclusion. *See Kar Kim Farms,* 199 F.3d at 993 (rejecting the producers' reliance on the Commission's interpretive letter); *Oeltjenbrun,* 3 F.Supp.2d at 1043 (same).

In summary, we are not persuaded by Sime Farms' arguments that a contract must constitute a sale as defined in

the U.C.C. in order to fall within the exclusion. In addition, we find nothing in the legislative history or the language of the exclusion itself that would limit application of the exclusion to contracts contemplating delivery in the same crop year as the year in which the grain is grown. Rather, we find the interpretation placed on the exclusion by the Eighth Circuit Court of Appeals to be most consistent with the intent of Congress as shown by the legislative history of this exclusion. In general, that interpretation would draw the following distinction between futures contracts and cash forward contracts. Contracts that merely serve as an investment vehicle to the public are futures contracts. In contrast, contracts that are clearly intended to enable a producer to price his grain in advance of harvest in order to facilitate *the ultimate exchange of grain for money* are cash forward contracts. With this distinction in mind, we now proceed to apply these principles to the contracts at issue here.

■ E. *Application of law.* When we apply the test, factors, and relevant considerations discussed in the *Kar Kim Farms* case to the facts before us, we conclude that the HTA contracts between the parties anticipated the actual delivery of corn by Sime Farms to the Coop. Although Sime Farms' obligation to deliver grain is not explicitly stated in the contracts, it is clearly implied by the insertion of an arrival period and destination. The evidence in the record also establishes that Sime Farms had entered into these contracts in the past and had delivered grain to the Coop in fulfillment of its contractual obligations. Although rolling was permitted, nothing in the record suggests that the parties did not anticipate actual delivery at some time. In addition, unlike the contracts in *Kar Kim Farms,* the HTA contracts at issue here did not contain a cancellation provision. Finally, both Sime Farms and the Coop were in the business of buying and selling grain, a circumstance that also supports a finding that actual

delivery of corn by Sime Farms to the Coop was expected.

Sime Farms relies on a decision of the Commodity Futures Trading Commission in *In re Competitive Strategies for Agriculture, Ltd.,* to support its contention that the Sime Farms contracts were illegal futures contracts. [1998–1999 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 27,771, at 48,678 (C.F.T.C. Sept. 17, 1999). Although the Commission held that the HTA contracts involved in the *Competitive Strategies* case were futures contracts, the characteristics of the contracts at issue there were significantly different from the contracts at issue here. In *Competitive Strategies,* the contracts between the cooperative and so-called "sellers" were marketed by an investment service to sellers who would never have grain to sell; some were not even farmers and did not own farmland. *Id.* at 48,685–87. Moreover, the surrounding circumstances of the transactions showed that delivery was never anticipated. *Id.* at 48,687. That is simply not the situation here, as we have just discussed.

In conclusion, we hold that the HTA contracts between Sime Farms and the Coop constituted "the sale of a cash commodity for deferred shipment or delivery" within the meaning of the statutory exemption. *See Oeltjenbrun,* 3 F.Supp.2d at 1045–47 (holding as a matter of law that contracts nearly identical to those at issue in this case were cash forward contracts falling within the statutory exemption). Therefore, we affirm the trial court's ruling that the contracts were legal.

IV. *Was The Trial Court Correct in Ruling That the Coop had Generated a Jury Question on the Issue of Whether the Coop had Reasonable Grounds for Insecurity?*

■ A. *Statement of issue.* One basis for the Coop's breach of contract claim was that Sime Farms failed to provide reasonable assurances upon the Coop's demand for such assurances. This claim

arises from article 2 of the Iowa Uniform Commercial Code, which governs the sale of grain in Iowa. *See Cargill, Inc. v. Fickbohm,* 252 N.W.2d 739, 742 (Iowa 1977) (applying article 2 remedies for nondelivery on a corn contract); *Nora Springs Co-op Co. v. Brandau,* 247 N.W.2d 744, 747 (Iowa 1976) (stating that contracts for the future delivery of corn are "within the ambit of Article 2 of the Iowa Uniform Commercial Code"). Under the U.C.C., a party to a contract who has reasonable grounds to believe that the other party will be unwilling or unable to perform his contractual obligations may require the party to provide adequate assurances of performance. *See* Iowa Code § 554.2609.

Sime Farms sought a directed verdict on the basis that the Coop lacked reasonable grounds for insecurity as a matter of law and, therefore, had no right to make a demand for assurances. The trial court held that the Coop had generated a jury question on the issue of reasonable grounds for insecurity and, accordingly, denied Sime Farms' motion. This ruling is assigned as error on appeal.

■■■■ *B. Scope of review.* We review the denial of a motion for directed verdict for correction of errors of law. *See Lawrence,* 534 N.W.2d at 418. The issue before us is simply whether there was "sufficient evidence to generate a jury question." *Federal Land Bank v. Woods,* 480 N.W.2d 61, 65 (Iowa 1992). In deciding this issue, we view the evidence in the light most favorable to the nonmoving party, "regardless of whether the evidence was contradicted." *Id.* We also afford the nonmovant every legitimate inference that can reasonably be drawn from the evidence. *See Lawrence,* 534 N.W.2d at 418. If reasonable minds could differ on resolution of the issue, it should be submitted to the jury. *See Woods,* 480 N.W.2d at 65.

*C. Applicable legal principles.* Section 554.2609 of the Iowa U.C.C. provides in relevant part:

1. A contract for sale imposes an obligation on each party that the other's expectation of receiving due performance will not be impaired. When reasonable grounds for insecurity arise with respect to the performance of either party the other may in writing demand adequate assurance of due performance and until that party receives such assurance may if commercially reasonable suspend any performance for which that party has not already received the agreed return.

2. Between merchants the reasonableness of grounds for insecurity and the adequacy of any assurance offered shall be determined according to commercial standards.

Because the reasonableness of a party's insecurity is determined by commercial standards, there must be an objective factual basis for the insecurity, rather than a purely subjective fear that the party will not perform. *See* R.J. Robertson, Jr., *The Right to Demand Adequate Assurance of Due Performance: Uniform Commercial Code Section 2–609 and Restatement (Second) of Contracts Section 251,* 38 Drake L.Rev. 305, 322 (1988–89).

Generally, the existence of grounds for insecurity is a question of fact:

Whether a party has reasonable grounds for insecurity depends upon many factors including the [party's] exact words or actions, the course of dealing or performance between the particular parties and the nature of the industry. What constitutes reasonable grounds for insecurity in one case might not in another. Consequently, the trier of fact must normally answer whether grounds for insecurity exist.

1 James J. White & Robert S. Summers, *Uniform Commercial Code* § 6–2, at 286 (4th ed.1995) [hereinafter White & Summers]; *see also AMF, Inc. v. McDonald's Corp.,* 536 F.2d 1167, 1170 (7th Cir.1976) ("Whether in a specific case a buyer has reasonable grounds for insecurity is a question of fact."); *Phibro Energy, Inc. v. Empresa De Polimeros De Sines Sarl,* 720

F.Supp. 312, 322 (S.D.N.Y.1989) (court noting, on summary judgment motion, that whether a party has reasonable grounds for insecurity is a question of fact and that "standard is high for finding of insecurity as a matter of law"). Nevertheless, occasions do arise where the undisputed facts establish that insecurity or the lack of insecurity existed as a matter of law. *See, e.g., BAII Banking Corp. v. UPG, Inc.*, 985 F.2d 685, 702–03 (2d Cir.1993) (finding error in submission of buyer's failure-to-provide-reasonable-assurances defense because no grounds for insecurity as a matter of law); *Kaiser–Francis Oil Co. v. Producer's Gas Co.*, 870 F.2d 563, 568 (10th Cir.1989) (upholding summary judgment on basis that reasonable grounds for insecurity existed as a matter of law where documentary evidence established that buyer had no intention of performing); *Green Constr. Co. v. First Indem. of Am. Ins. Co.*, 735 F.Supp. 1254, 1262–63 (D.N.J.1990) (holding reasonable grounds for insecurity existed as a matter of law).

D. *Discussion.* The Coop's letter to Sime Farms reveals two grounds for insecurity: (1) the inverse in the market; and (2) statements in the press with respect to the unenforceability of HTA contracts. Because neither ground relates specifically to Sime Farms, Sime Farms asserts these facts do not provide reasonable grounds for the Coop to be concerned about *Sime Farms'* performance.

> "Clearly, the drafters of the Code did not intend that one party to a contract can go about demanding security for performance of the other whenever he gets nervous about a contract. Some reason for the demand for assurances must precede the demand."

Robertson, 38 Drake L.Rev. at 323 (quoting *Cole v. Melvin,* 441 F.Supp. 193, 203 (D.S.D.1977)). In many cases, the grounds for insecurity are specifically tied to the party or the contract. *See, e.g., AMF, Inc.,* 536 F.2d at 1170 (holding that where prototype had never performed satisfactorily and evidence existed that seller was not actively working on project, buyer had

reasonable grounds for insecurity); *Scott v. Crown,* 765 P.2d 1043, 1046 (Colo.Ct. App.1988) (finding fact that investigator told seller of active complaints against buyer and that buyer failed to make personal contact after seller refused to load wheat constituted grounds for insecurity). On the other hand, "[a] ground for insecurity need not arise from or be directly related to the contract in question." U.C.C. § 2–609 official cmt. 3.

> The grounds for insecurity need not arise from circumstances directly related to the parties or the contract itself. Thus, where the market price of a commodity is rising, the buyer may be justified in seeking assurances of performance from the seller *even though the seller did nothing to cause buyer's insecurity.*

White & Summers § 6–2, at 288 (emphasis added). Furthermore, in *Diskmakers, Inc. v. DeWitt Equipment Corp.,* 555 F.2d 1177 (3d Cir.1977), the Third Circuit Court of Appeals stated:

> "As between merchants, the test for determining when reasonable grounds for insecurity arise and what will constitute an adequate assurance of future performance is a commercial criterion. *Any facts which should indicate to a reasonable merchant that the promised performance might not be forthcoming when due should be considered reasonable grounds for insecurity . . . ."*

555 F.2d at 1180 (quoting N.J. Stat. Ann. § 12A:2–609 study cmt. 1 (1962)) (emphasis added).

■ We think the market conditions existing in June 1996, combined with the widely-publicized statements that HTA contracts were illegal and unenforceable, are facts that would support a jury finding that the Coop had a reasonable basis to be concerned that Sime Farms may not perform under its contracts. The inverse in the market unquestionably made delivery under the contracts an unprofitable venture for Sime Farms. Although the Coop agreed in the contracts to pay all margins

and commissions, both parties understood that any inverse would be deducted from the contract price if Sime Farms chose to roll the contracts. Consequently, if a future roll became necessary, the ultimate risk of an inverse market rested with the producer, not the Coop. That was precisely the situation here; another roll was inevitable because Sime Farms had no grain to deliver under the July contracts. Consequently, it would eventually have to roll at least to December 1996, at which time the inverse would reduce its price per bushel to a level at which it would not even recover its costs of production. Clearly, a producer in these circumstances would have every incentive to claim that the contracts were illegal and unenforceable, as the Iowa Attorney General's office had opined.

In addition, the jury was entitled to consider the market factors in the context of the relationship between the Coop and Sime Farms. *See* White & Summers § 6–2, at 286 ("Whether a party has reasonable grounds for insecurity depends upon many factors including the [party's] exact words or actions, the course of dealing or performance between the particular parties and the nature of the industry."); *see also Johnson v. Land O'Lakes*, 181 F.R.D. 388, 395 (N.D.Iowa 1998) (stating that "evidence of the context in which the demand is made is certainly relevant and admissible"). The Coop's local manager, Paul Nesler, spoke with Mark Sime in May to determine what Sime Farms intended to do about its July contracts. Sime was clearly aware of the inverse in the market and his need to roll the contracts to December; yet he did not contact the Coop to take any steps to work out a plan.

Sime Farms places great reliance on the testimony of Nesler, who when asked, "Did you ever believe that he [Sime] wouldn't deliver before June 6, 1996?" responded, "No, I thought Mark would probably deliver." Sime Farms claims that this testimony establishes as a matter of law that the Coop was never insecure about Sime Farms' performance. Although Nesler signed the demand for assurances on behalf of the Coop, he testified he did not draft it. The jury could certainly have concluded that Nesler's personal feelings did not reflect the Coop's belief as to Sime Farms' likely performance. Moreover, Nesler stated several times in his testimony that he was concerned that Sime had not come to the Coop with a plan, especially in view of Nesler's request that he do so. The jury was entitled to consider Nesler's testimony in its entirety and, in doing so, could discount some testimony and give more credit to other testimony. The weight to be given Nesler's testimony was for the jury to determine. *See Field v. Palmer*, 592 N.W.2d 347, 353 (Iowa 1999) (holding that credibility of witness's testimony is for the jury).

We hold there was sufficient evidence to generate a jury question on whether the Coop had an objectively reasonable basis for insecurity. Therefore, the trial court did not err in refusing to grant Sime Farms' motion for directed verdict on this basis.

## V. Was the Coop's Demand for Assurances Unreasonable as a Matter of Law?

A. *Issue and scope of review.* Sime Farms claimed at trial that the Coop's demand for assurances was unreasonable as a matter of law and, as a result, constituted a repudiation of the contract. It claims that the trial court erred in failing to grant its motion for directed verdict on this issue. We apply the same scope of review as set out in the preceding division of this opinion.

B. *Applicable law.* Sime Farms' repudiation argument rests on its contention that the Coop's demand for assurances imposed conditions that went beyond the contract and that the Coop's performance was contingent upon acquiescence to these conditions. Sime Farms contends such a demand constitutes an anticipatory repudiation.

We disagree with Sime Farms' contention. The mere fact that the assurances demanded by the Coop necessitated action beyond that required by the contract does not render the demand unreasonable as a matter of law. As noted by a leading treatise on the Uniform Commercial Code,

[a]ll demands for adequate assurance call for more than was originally promised under the contract, and that is precisely what 2–609 authorizes. If, for example, it was appropriate to sell on open credit at the outset of a contract but subsequent events cause insecurity, 2–609 calls for modification of the contract to provide greater security to the seller than the seller could have demanded, absent such insecurity. Thus it is the very purpose of 2–609 to authorize one party to insist upon more than the contract gives.

White & Summers § 6–2, at 288; *see also* U.C.C. § 2–610 official cmt. 2 ("[A] demand by one or both parties for more than the contract calls for in the way of counterperformance is not in itself a repudiation."); Robertson, 38 Drake L.Rev. at 341 (noting that an insecure promisee can demand assurance in the nature of additional performances not required by the underlying contract, provided there are reasonable grounds for insecurity).

The cases upon which Sime Farms relies for a contrary position are not on point. *See National Farmers Org. v. Bartlett & Co., Grain,* 560 F.2d 1350 (8th Cir.1977); *Pittsburgh–Des Moines Steel Co. v. Brookhaven Manor Water Co.,* 532 F.2d 572 (7th Cir.1976); *Westinghouse Elec. Corp. v. CX Processing Labs., Inc.,* 523 F.2d 668 (9th Cir.1975); *Pillsbury v. Ward,* 250 N.W.2d 35 (Iowa 1977). Although the court in the *Pittsburgh–Des Moines Steel* case discusses, in dicta, whether a demand for more than "adequate assurances" constitutes a repudiation, it ultimately holds that there was no proof of reasonable grounds for insecurity. 532 F.2d at 581. Moreover, commentators have criticized the court's dictum. *See* White & Summers § 6–2, at

289; Robertson, 38 Drake L.Rev. at 340–41. The *National Farmers, Westinghouse Electric,* and *Pillsbury* cases do not even deal with the issue of whether a demand for assurances is reasonable. Consequently, any statements made in these cases that an anticipatory repudiation results from a party's conditioning of future performance upon requirements outside the contract is simply not persuasive authority in the context of a reasonable demand for assurances.

In summary, the mere fact that the Coop demanded performance beyond that required by the contract did not transform its demand into a repudiation as a matter of law. Therefore, the trial court did not err in submitting the question of the reasonableness of the Coop's demands to the jury.

VI. *Did the Trial Court Err in Admitting Evidence of Oral Conversations That Modified the Coop's Written Demand for Assurances?*

▉ Sime Farms claims that testimony concerning conversations between the parties after the Coop's demand letter that modified the assurances required by the Coop was inadmissible. Sime Farms contends that this testimony violates the parol evidence rule. *See Seastrom v. Farm Bureau Life Ins. Co.,* 601 N.W.2d 339, 345 (Iowa 1999) (" 'When applicable, the parol evidence rule excludes extrinsic evidence which is solely offered for the purpose of varying, adding to, or subtracting from a written agreement.' " (quoting *Kroblin v. RDR Motels, Inc.,* 347 N.W.2d 430, 433 (Iowa 1984))).

The Coop asserts that error was not preserved because Sime Farms made no objection to admission of this evidence until it filed its motion for judgment notwithstanding the verdict and for new trial. Sime Farms acknowledges that it did not object when the testimony was offered, but asserts that it was not obligated to do so. It also claims that any error preservation problem has been waived by the Coop due

to its failure to alert the trial court to this issue at the time of the post-trial motions.

We reject Sime Farms' argument that the Coop's failure to raise an error preservation problem in the district court precludes this court from addressing the issue of error preservation on appeal. It is true that one purpose of our error preservation rules is to ensure that the opposing party and the district court are alerted to an issue at a time when corrective action can be taken or another alternative pursued. *See State v. Mann,* 602 N.W.2d 785, 790 (Iowa 1999). That is not the only purpose, however. These rules are also designed to preserve judicial resources by avoiding proceedings that would have been rendered unnecessary had an earlier ruling on the issue been made. *See generally id.* at 790–91. Consequently, there is more at stake than simply the interests of the opposing party.

Here, for example, if there is merit to Sime Farms' objection to the testimony in question—an issue we do not reach—a ruling by the trial court at the time the evidence was offered would have avoided the prospect of a new trial by giving the court an opportunity to prevent admission of the evidence. Had an early ruling been made, the trial court, as well as this court, would not be faced with the possibility of ordering a new trial, with the consequent waste of judicial resources spent on the first trial.

In view of the range of interests protected by our error preservation rules, this court will consider on appeal whether error was preserved despite the opposing party's omission in not raising this issue at trial or on appeal. Accordingly, the Coop's failure to object to the trial court's consideration of the parol evidence issue in its ruling on Sime Farms' post-trial motion does not preclude this court from determining whether error has been properly preserved. We turn now to that issue.

Sime Farms claims that it was not required to object to admission of the disputed testimony as inadmissible parol evidence because the parol evidence rule is a substantive rule of law and not a rule of evidence. *See Montgomery Props. Corp. v. Economy Forms Corp.,* 305 N.W.2d 470, 475 (Iowa 1981) ("The parol evidence rule is not a rule of evidence, but is a rule of substantive law."). We have long held, however, that a failure to object to the admission of parol evidence at trial prevents a party from assigning the admission of such evidence as error on appeal. *See, e.g., Kline v. Reeder,* 203 Iowa 396, 397, 212 N.W. 693, 694 (1927); *Berry v. Kritenbrink,* 185 Iowa 1121, 1122, 171 N.W. 582, 582 (1919). Thus, our standard error preservation rules apply to objections made to the admission of evidence, even though the objections rest on a substantive rule of law as opposed to a rule of evidence.

Here, Sime Farms first objected to the parol evidence in its post-trial motion for judgment notwithstanding the verdict and for new trial. A motion for judgment notwithstanding the verdict cannot be based on a ground not raised in a motion for directed verdict. *See Dutcher v. Lewis,* 221 N.W.2d 755, 760 (Iowa 1974). Likewise, a motion for new trial must rest on an exception or objection made at trial. *See id.* at 758. Accordingly, Sime Farms failed to preserve error, as its objection to the evidence was too late. Therefore, we cannot rule on the merits of its objection.

## VII. *Summary.*

The HTA contracts between the Coop and Sime Farms fall within the Commodity Exchange Act's exception for "any sale of any cash commodity for deferred shipment or delivery" because the parties contemplated actual delivery of grain by Sime Farms to the Coop. Therefore, the contracts are legal and enforceable.

The record before the trial court was sufficient to generate a jury question on the issues of whether the Coop had reasonable grounds for insecurity and whether its demand for assurances was reasonable. Therefore, the trial court did not err in

overruling Sime Farms' motion for directed verdict.

Sime Farms failed to preserve error on its parol evidence objection to testimony of the Coop's local manager modifying the assurances sought by the Coop. The Coop's failure to raise the error preservation issue when it had the opportunity to do so in the district court does not prevent this court from considering the error preservation issue on appeal.

**AFFIRMED.**

All justices concur except CARTER, J., who takes no part.