# IN THE COURT OF APPEALS OF IOWA

No. 19-2064
Filed April 1, 2020

**IN THE INTEREST OF R.C.,**
**Minor Child,**

**G.D., Mother,**
          Appellant.
_____

Appeal from the Iowa District Court for Cherokee County, Mary L. Timko, Associate Juvenile Judge.

In a child-in-need-of-assistance proceeding, the mother challenges the district court's denial of her request for additional visitation and for paternity testing to overcome the legal father's paternity. **AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

Harold K. Widdison of Law Office of Harold K. Widdison, P.C., Sioux City, for appellant mother.

Thomas J. Miller, Attorney General, and Mary A. Triick, Assistant Attorney General, for appellee State.

Lesley D. Rynell of Juvenile Law Center, Sioux City, attorney and guardian ad litem for minor child.

Considered by Vaitheswaran, P.J., May, J., and Potterfield, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2020).

2

**POTTERFIELD, Senior Judge.**

R.C., who was born in 2009, is a child with special needs. Child-in-need-of-assistance (CINA) proceedings were initiated in 2015 following a founded child-abuse assessment against the parents. The Iowa Department of Human Services (DHS) was given information that the legal father may not be the child's biological father, but no paternity testing was ordered.

A permanency order was entered in March 2017. Pursuant to the permanency order, R.C. was placed in the custody of his father and lives in a residential care facility for children who need constant care and supervision. *See* Iowa Code § 232.104(2)(d)(2) (2015) (providing the court may, after a permanency hearing, enter an order transferring sole custody of the child from one parent to another parent). With permanency established in the father, the juvenile court ended reunification services between R.C. and the mother, and R.C.'s guardian ad litem (GAL) and DHS were charged with arranging and approving future visitation between R.C. and the mother.

In June 2019, the mother filed a motion in the juvenile court, asking for expanded visitation with R.C. She noted she was receiving one four-hour supervised visit with R.C. each month and asked for an additional four-hour visit that was unsupervised each month.

In August 2019, the mother filed a second motion, asking the court to order paternity testing on R.C. According to the mother, while R.C. was born during the mother's marriage to the father, a different man is the biological father of R.C.

The juvenile court took up both issues at the permanency review hearing in November 2019. At the hearing, the mother initially testified she thought it would be best for R.C. if he could get to know his purported biological father in addition to the father he has always known. But later during her testimony, she admitted she was angry at the father, to whom she is no longer married, and was motivated to file for paternity testing by her desire to get him "completely out of the picture," whether or not it is in R.C.'s best interests. She conceded it would likely be confusing for R.C. to learn of another father at this point in life. Additionally, she admitted she was trying to fight the father for custody of R.C. in district court[1] and wanted the juvenile court to order the paternity testing because she thought it would help her with her custody case.[2]

As for her request for additional visitation time with R.C., the mother offered into evidence an email from R.C.'s therapist, written on August 8, 2019, stating:

> FYI. As we have had a couple of sessions with [the mother] over the last month, it seems that [R.C.] enjoys his time with his mother. He is not verbalizing or showing through behaviors that

---

[1] The juvenile court granted concurrent jurisdiction to the district court to allow the dissolution proceedings but retained jurisdiction over the issue of custody of R.C. No party has appealed the juvenile court's order limiting the district court's jurisdiction. The mother did not seem to be aware of the limitation on concurrent jurisdiction, as she testified several times about seeking custody of R.C. in district court.

[2] The mother denied seeking the order for paternity testing in juvenile court so she would not have to pay for it. But the same month the mother filed the motion for paternity testing, she stole a person's credit or debit card number and then used it to purchase lottery tickets. She was later convicted of forgery as a result. According to the mother's testimony at the permanency review hearing, she committed the forgery because she "was fighting for a custody battle for [R.C.]" When asked again, the mother agreed she committed the forgery to secure financing for a custody battle in district court.

> this increased contact is negatively impacting him. I have seen no reaction from him that causes concerns with their contact.
> I would recommend increasing his supervised visitation at [the residential facility] home with mom.

The State offered more of the string of emails into evidence, noting that the question of the mother's visits' impact on R.C. was ongoing. In an August 19 email, the therapist stated:

> [R.C.] had a visit with his mom this past Saturday (8/17/19). It was noted that during the visit she had him laying on the floor like an infant to clean him after using the restroom. My staff have seen an increase in defiant behaviors since the visit. He is refusing to shower, he is struggling with personal space (more than normal), he is not wanting to listen or complete his schedule. He will [throw] his food in the trash so that he can watch TV. He will go into the restroom, but doesn't do anything and when asked if he needs help he won't respond. [R.C.] is a child that normally needs prompts to stay on task, but after the weekend it has come to an all time high.

One of the reports offered into evidence by the State included an update from the therapist, sent September 27, 2019. The update noted that R.C.'s "unsupervised contact with his mother [over the holidays in late 2018] triggered negative feelings and behaviors." As a result, the therapist recommended only supervised visits between the mother and R.C. Additionally, it stated:

> [R.C.] continues to be defiant and have behavioral issues. He has also continued to exhibit inappropriate boundaries with others and touch himself sexually. In therapy, we have continued to explore feelings. . . . Sessions with [the mother] have been appropriate. [R.C.] expresses that he likes having session with his mother and there haven't been any boundary issues observed by this therapist. . . . [R.C.] no longer expresses missing his mother. With [his] continued defiant and inappropriate behaviors, it is unclear whether this is because he wants to see his mother more or if seeing her triggers negative memories that cause negative behaviors. He has essentially been able to see his mother twice monthly for the last couple of months. Seeing her more often doesn't appear to be helping to reduce the negative behavior.

The GAL maintained that it was not in R.C.'s best interests to expand the mother's visitation. She questioned whether the mother was motivated to request more time in an effort to better situate herself for the custody case she planned to pursue. Additionally, the GAL noted that the mother failed to attend R.C.'s annual review at the residential home on September 17, even though

> the review is very detailed and includes all of his medical, vocational, educations, and mental health needs. The team reviews all of his special needs and each service that is provided to . . . specifically address each need. It also sets forth the treatment plan for the next year in anticipation of his future needs.

In its written ruling, the court denied both of the mother's requests, finding neither paternity testing nor expanded visitation was in R.C.'s best interests. The mother appealed.

Our review of CINA proceedings is de novo. *In re D.D.*, 653 N.W.2d 359, 361 (Iowa 2002). "The most important consideration in any CINA case is the best interests of the child." *Id.* at 362. The mother's requests amount to an attempt to modify the permanency order; "[w]hen considering the modification of a permanency order, we 'look solely at the best interests of the child[] for whom the permanency order was previously entered.'" *In re J.M.*, No. 19-0772, 2019 WL 3317430, at *2 (Iowa Ct. App. July 24, 2019) (quoting *In re A.S.T.*, 508 N.W.2d 735, 737 (Iowa Ct. App. 1993)).

While the mother admitted during her testimony that her request for paternity testing was motivated by anger, she wanted the father out of R.C.'s life, and she did not care if it was in R.C.'s best interests, the court should have ordered the requested paternity testing. *See* Iowa Code §§ 600B.41A(3)(a)(1) (noting the mother of the child may file a petition to overcome paternity before the

child reaches majority); 600B.41A(3)(e) (including as one of the conditions to overcome paternity "[b]lood or genetic testing in accordance with section 600B.41"); *see also* 600B.41(1) ("In a proceeding to establish paternity in law or in equity the court may on its own motion, *and upon request of a party shall*, require the child, mother, and alleged father to submit to blood or genetic test." (Emphasis added.)). This statute does not specifically authorize the mother to challenge paternity in the juvenile court, but, as we noted before, the juvenile court has retained jurisdiction over R.C.

We understand the juvenile court's concern regarding whether parental upheaval is in the best interests of R.C., as the father continues to be an active part of R.C.'s life and seems to want to maintain his role as R.C.'s father. Even assuming the genetic testing establishes that the father is not biologically related to R.C., the court may ultimately dismiss the action to overcome paternity and maintain the father's rights after further proceedings. *See id.* § 600B.41A(6)(a) (allowing the court to preserve the paternity of the established father when the established father requests that the parent-child relationship continue and the court finds it is in the child's best interest to do so).

This case does not involve termination of parental rights since permanency has been established pursuant to Iowa Code section 232.104(2)(d)(2) However, we note that Iowa Code section 232.111(4)(b)(1) requires a petition for termination parental rights to include "[t]he names, residences, and domicile, of any…[l]iving parents of the child." Section 232.112 states those individuals

> shall be necessary parties to a termination of parent-child relationship proceeding and are entitled to receive notice and an opportunity to be heard, except that notice be dispensed with in the case of any such person whose name or whereabouts the court determines is unknown and cannot be ascertained by reasonably diligent search.

In addition,

> A diligent search is measured not by the quantity of the search but the quality of the search. In determining whether a search is diligent, we look at the attempts made to locate the missing person or entity to see if attempts are made through channels expected to render the missing identity.

*In re S.P.*, 672 N.W.2d 842, 846 (Iowa 2003) (quoting *Qualley v. State Fed. Sav. & Loan*, 487 N.W.2d 353, 355 (Iowa Ct. App. 1992)). "Any hearings or proceedings . . . subsequent to the filing of a [CINA] petition shall not take place without the presence of the child's parent . . . ." Iowa Code § 232.91(1).

The State concedes it knew the legal father of the child is not his biological father. Indeed, days after the State filed its CINA petition in late 2015, a report stated as much. Similar statements appeared in 2016 and 2017 reports. The mother testified DHS was "aware that [the legal father] was not [the child's] biological father from day one."

Despite this knowledge, DHS took no action to ascertain the name, residences, or domicile of the biological father. Notably, the putative biological father filed an affidavit in connection with the mother's motion for paternity testing attesting he might be the biological father and stating he "went to the Juvenile Offices in Sioux City, Iowa" more than eighteen months earlier to inquire "about a paternity test" but was told he "wasn't listed on the birth certificate" and he would need to get the legal father's permission for testing. The putative biological

father stated, "I knew he would never give me permission, so I didn't ask." Assuming DHS lacked the ability to glean the biological father's identity from other sources such as the legal father and biological mother, the affidavit afforded the agency actual notice of the putative father's identity. When the affidavit was filed, the biological father was not just a living parent whose identity should have been reasonably ascertained, but a "known" parent who was entitled to "[n]otice of the pendency of the case." *Id.* § 232.37(1).[3]

The affidavit of the purported biological father was not filed until 2019. But the onus was not on the putative father to make his whereabouts known so that he could participate in the proceedings but on the State to notify him of the proceedings. Of course, the putative father's claim that he was the father would have to be established. *See id.* § 232.2(39) ("'Parent' means a biological or adoptive mother or father of a child; or a father whose paternity has been established . . . by order of a court of competent jurisdiction, or by administrative order when authorized by state law."); *In re J.C.*, 857 N.W.2d 495, 501–02 (Iowa 2014).

We recognize the mother may have raised the paternity issue out of animus toward the legal father. But her motives did not obviate the State's obligation to establish the biological parents of children in need of assistance and to provide them with notice and an opportunity to be heard. *See S.P.*, 672 N.W.2d at 845 ("Notice of the hearing and an opportunity to be heard appropriate to the nature of the case is the most rudimentary demand of due process of law

---

[3] We recognize this statute is part of the division on juvenile delinquency proceedings.

in proceedings affecting parental rights to children." (quoting *Stubbs v. Hammond*, 135 N.W.2d 540, 543 (1965))).

We agree with the juvenile court that the mother failed to meet her burden to prove that expanding her visitation time with R.C. is in R.C.'s best interests. *See In re D.S.*, 563 N.W.2d 12, 15 (Iowa Ct. App. 1997) (considering whether the parent met their burden to modify the permanency order). R.C.'s therapist was unable to determine whether R.C.'s negative behaviors were directly or indirectly related to the time he sees the mother. But the mother has not taken advantage of all of the visits she is currently scheduled with R.C.; she admitted she missed her October visit with him, and she did not attend his annual review, which took place in September. The mother loves R.C., but it is not clear that additional time with the mother is good for him.

The juvenile court should have ordered paternity testing, so we reverse and remand on this issue. We otherwise affirm the juvenile court order on permanency review, including the denial of the mother's request for expanded visitation. R.C. remains in the custody of the father.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

Vaitheswaran, P.J., concurs; May, J., partially dissents.

**MAY, Judge** (concurring in part and dissenting in part).

The mother gave the juvenile court no reason to believe that any statute required court-ordered paternity testing. She cited no statute in her motion or at the hearing. So I would not reverse on statutory[4] grounds, none of which were presented to the juvenile court. *See State v. Thompson*, 836 N.W.2d 470, 491 (Iowa 2013) ("On appeal, Thompson relies on Iowa Rule of Criminal Procedure 2.24(2)(b)(6) and *State v. Ellis*, 578 N.W.2d 655, 659 (Iowa 1998). However, Thompson's counsel never cited that rule or *Ellis* in his posttrial motion or during the hearing on that motion in district court. . . . We agree with the State that Thompson failed to preserve error on his claim the district court applied the wrong standard under rule 2.24(2)(b)(6)."); *State v. Hernandez-Lopez*, 639 N.W.2d 226, 234 (Iowa 2002) (concluding an alleged violation of statutory rights was not preserved where it was raised for the first time on appeal); *see also Top of Iowa Co-op. v. Sime Farms, Inc.*, 608 N.W.2d 454, 470 (Iowa 2000) ("In view of the range of interests protected by our error preservation rules, this court will consider on appeal whether error was preserved despite the opposing party's omission in not raising this issue at trial or on appeal.").

As to this issue, I respectfully dissent. Otherwise, I concur with the majority opinion.

---

[4] My colleagues point to certain provisions within Iowa Code chapters 232 and 600B (2015). Even if those provisions had been raised below, it is not clear to me that they would have required the juvenile court to order paternity testing in this child-in-need-of-assistance case. Sections 232.111(4)(b)(1) and 232.112 relate to termination of parental rights proceedings. Section 232.37 relates to juvenile delinquency proceedings. Chapter 600B actions are "ordinary proceedings" that "shall be brought in the district court." Iowa Code § 600B.10.