**IN THE COURT OF APPEALS OF IOWA**

No. 14-1773
Filed October 12, 2016

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**DONALD DEAN GRIDLEY,**
        Defendant-Appellant.
_____

        Appeal from the Iowa District Court for Wapello County, Myron L. Gookin,

Judge.


        Donald Gridley appeals his conviction for vehicular homicide, alleging

various errors in his jury trial. **AFFIRMED IN PART, REVERSED IN PART, AND**

**REMANDED.**



        Mark C. Smith, State Appellate Defender, and Bradley M. Bender,

Assistant Appellate Defender, for appellant.

        Thomas J. Miller, Attorney General, and Louis S. Sloven, Assistant

Attorney General, for appellee.


        Considered by Danilson, C.J., and Vaitheswaran and Tabor, JJ.

**VAITHESWARAN, Judge.**

A truck slid down an embankment and crashed, killing Donald Gridley's father. The State charged Gridley with vehicular homicide, defined as "unintentionally caus[ing] the death of another by operating a motor vehicle while intoxicated." *See* Iowa Code § 707.6A(1) (2013). A jury found him guilty.

On appeal Gridley (1) challenges the sufficiency of the evidence supporting the jury's finding of guilt, (2) contends the district court should have excluded certain opinion testimony proffered by a law enforcement officer, (3) argues the district court erred in instructing the jury on his refusal to provide a urine sample, and (4) contends the district court applied an incorrect standard in ruling on his motion for new trial.

## I.     Sufficiency of the Evidence

The jury was instructed the State would have to prove (1) "the defendant operated a motor vehicle," (2) while under the influence, and (3) as a result of these acts he "unintentionally caused the death of" his father. Gridley challenges the evidence supporting the first element—whether he was the person who operated the motor vehicle. He claims his father operated the vehicle. The jury could have found the following facts.

Gridley and his father attended a funeral. At the reception, Gridley estimated he consumed at least seven or eight alcoholic drinks. Early the following morning, a deputy sheriff responded to a 911 call from a farmhouse. Gridley was outside. Gridley told the deputy he was involved in a vehicle accident and thought "his dad was possibly dead." The deputy noted that Gridley had "bloodshot, watery eyes, . . . slurred speech, [and] [smelled] of alcohol." He

surmised Gridley had been drinking. A urine test taken several hours later revealed "a urine alcohol concentration of 0.198 grams per 67 mils of urine," a level that, according to the tester, could impair an individual. The test also was positive for marijuana metabolites, oxycodone, and benzodiazepines.

The deputy drove Gridley to the scene of the accident. He found Gridley's father pinned on the floorboard of the passenger side of the vehicle, facing the passenger side door. The deputy did not see "any evidence that [Gridley's father] was moved from the driver's seat to the passenger seat." Other witnesses who arrived at the scene confirmed the impracticability of Gridley's assertion that he had repositioned his father.

Two volunteer firemen at the scene heard Gridley ask, "Did I kill my father? Is he going to die? Did I kill my father?" A paramedic testified Gridley "initially admitted that he was the driver of the vehicle." While the paramedic conceded Gridley "seemed confused," he stated the confusion was "just over [his] questions later."

A deputy sheriff testified he "saw a red mark on [Gridley's] chest" that "resembled a steering wheel mark." A state trooper agreed with the prosecutor that "damage to a steering wheel" could "cause injuries to the driver of [a] vehicle" and this evidence could be used to identify the driver. An agent with the department of criminal investigation opined that two blood samples collected from the steering wheel and driver's side of the dashboard "matched the known profile of Donald Gridley." Gridley's father "was eliminated as the source of the DNA found on those two samples."

A reasonable juror could have found from this evidence that Gridley, rather than his father, drove the vehicle. Although several witnesses testified the vehicle belonged to Gridley's father and he never allowed others to drive it, jurors could have discredited most of these witnesses based on their close relationship with the Gridleys.

We acknowledge that one defense witness did not fall into this category because she first met the Gridleys at the reception. She struck up a conversation with Gridley's father and learned he "was extremely adamant to a very significant degree that only he drove his truck." She came close to accepting a ride from him and went so far as to approach the passenger side of the Gridley vehicle. She testified Gridley's father "had the driver's door opened, and he was on the driver's side right by the door," while Gridley "was on the passenger side" with her. Ultimately, she accepted a ride with someone else and left before the Gridleys got into their vehicle. While this testimony appears to cast doubt on whether Gridley drove the vehicle, a reasonable juror could have ascribed limited weight to the woman's statements in light of her early departure.

Substantial evidence supports the jury's finding of guilt. *See State v. Tinius*, 527 N.W.2d 414, 416 (Iowa Ct. App. 1994) (finding substantial evidence to support a conviction for vehicular homicide notwithstanding evidence that a person who died in the car accident "had driven the car on prior occasions, and was known to generally prefer driving a vehicle over riding as a passenger, especially after drinking at bars").

## II. Expert Testimony

Gridley challenges the State trooper's testimony that he was "aware . . . steering wheel marks can be left on the driver of a vehicle" and "those types of marks, [are] evidence you can use to help determine who the driver is." The trooper also agreed with the prosecutor that "when there's damage to a steering wheel . . . it [could] also cause injuries to the driver of the vehicle," and "a semicircle in the abdomen region [would] be consistent with striking a steering wheel." Finally, the trooper discussed the injuries sustained by Gridley's father and opined that these injuries placed him on the passenger side of the vehicle.

Gridley asserts (1) the trooper's testimony was based "largely on witness statements or information obtained through police investigation" rather than his personal observations, (2) the testimony "improperly vouched for" the deputy sheriff's testimony about the mark on Gridley's chest, and (3) the trooper was not qualified as a forensic pathologist who could testify to the source of injuries sustained by Gridley's father.

Gridley did not object to the trooper's opinion testimony about the mark on his chest and its relationship to the steering wheel. Accordingly, he did not preserve error and we will review his first two contentions under an ineffective-assistance-of-counsel rubric. *See State v. Maxwell*, 743 N.W.2d 185, 195 (Iowa 2008). "Ineffective-assistance-of-counsel claims based on failure to preserve error are not to be reviewed on the basis of whether the claimed error would have required reversal if it had been preserved at trial. Rather, a defendant must demonstrate a breach of an essential duty and prejudice." *Id.* at 196. We find the record adequate to address the issue.

We begin with Gridley's challenge to the trooper's testimony based on his lack of personal knowledge. Our courts have consistently allowed law enforcement officers to opine on matters gleaned through the observations of other officers, whether or not the matters are within the personal knowledge of the testifying officer. *See State v. Owens*, 418 N.W.2d 340, 342 (Iowa 1988) ("[I]t is well established that when police officers are acting in concert, the knowledge of one is presumed shared by all."); *State v. Schubert*, 346 N.W.2d 30, 32 (Iowa 1984) ("[W]here law enforcement authorities are cooperating in an investigation, . . . the knowledge of one is presumed shared by all."); *see also State v. Palmer*, 554 N.W.2d 859, 868 (Iowa 1996) ("Our conclusion in no way undermines the validity of our prior cases applying the rule of shared knowledge in other situations."). Pursuant to this shared knowledge doctrine, the trooper permissibly relied on the deputy sheriff's testimony about the injury in opining about its possible source. On our de novo review, we conclude Gridley cannot establish counsel's breach of an essential duty in failing to object to the trooper's testimony for lack of personal knowledge.

We turn to Gridley's assertion that the state trooper "improperly vouched for [another officer's] testimony that [he] sustained a red mark to his abdominal area during the accident." Opinions prohibiting personal vouching have arisen primarily, if not exclusively, in child victim cases, where the expert's testimony either bolsters the credibility of the victim or undermines the credibility of the defendant. *See State v. Tyler*, 867 N.W.2d 136, 165-66 (Iowa 2015). Those opinions are inapposite. The trooper did not comment on or impugn the defendant's credibility; he simply used shared law enforcement information to

opine on a possible source of Gridley's injury. Defense counsel did not breach an essential duty in failing to challenge the testimony on this basis.

We are left with Gridley's challenge to the trooper's qualifications to opine that the facial injuries sustained by Gridley's father were consistent with having been seated on the passenger side of the vehicle. Counsel preserved error on this issue by objecting to the trooper's qualifications at trial. Accordingly, we review the issue directly under an abuse of discretion standard. *See Hyler v. Garner*, 548 N.W.2d 864, 868 (Iowa 1996) ("Whether a witness is sufficiently qualified to testify as an expert is within the court's discretion," and "we reverse only for a manifest abuse of discretion to the prejudice of the complaining party.").

There is no question the trooper lacked training as a forensic pathologist. However, he possessed extensive experience as an accident investigator, having examined "70 to 80 technical collision[s]" in twelve years. His opinion was based on an examination of the vehicle and his observation of damage to the rear view mirror that was consistent with the mark on the face of Gridley's father. This opinion fell well within the scope of the trooper's experience and training. *See* Iowa R. Evid. 5.702 (authorizing "witness qualified as an expert by knowledge, skill, experience, training, or education" to testify on matters that "will assist the trier of fact to understand the evidence or to determine a fact in issue"); *State v. Johnson*, No. 02-1818, 2003 WL 22698004, at *3 (Iowa Ct. App. Nov. 17, 2003) (concluding officer's "previous experience and training provided him with sufficient specialized knowledge to testify that the injuries observed on [defendant] were consistent with those suffered by drivers of automobiles in slow

speed crashes"). Accordingly, the district court did not abuse its discretion in overruling the objection to the trooper's qualifications.

### III.    Jury Instruction on Test Refusal

One of the deputy sheriffs testified he "requested a urine sample" from Gridley, and Gridley refused to provide one. Gridley did not object to the testimony but did object to a jury instruction on how to construe the refusal. The instruction stated: "The defendant was asked to give a urine sample so it could be analyzed to determine the percent of alcohol in his blood. The defendant refused. A person is not required to give a sample of any bodily substance; however, you may consider a refusal in reaching your verdict." Gridley asserted the instruction was improper because the State failed to establish the foundational "steps necessary for invoking implied consent." The district court overruled the objection.

On appeal, Gridley argues "there [was] a lack of evidence that the law enforcement officer[] properly invoked implied consent."[1] The State concedes error was preserved. Assuming without deciding this is the case, we will proceed to the merits. *See Top of Iowa Coop v. Sime Farms, Inc.*, 608 N.W.2d 454, 470 (Iowa 2000) ("[T]his court will consider on appeal whether error was preserved despite the opposing party's omission in not raising this issue at trial or on appeal."); *State v. Johnson*, 223 N.W.2d 226, 229 (Iowa 1974) ("No objection

---

[1] Iowa Code § 321J.6(1) states:

> A person who operates a motor vehicle in this state under circumstances which give reasonable grounds to believe that the person has been operating a motor vehicle in violation of section 321J.2 or 321J.2A is deemed to have given consent to the withdrawal of specimens of the person's blood, breath, or urine and to a chemical test or tests of the specimens for the purpose of determining the alcohol concentration or presence of a controlled substance or other drugs . . . .

was made to the evidence showing the circumstances under which the mortgage was made. Objection was first made when the instruction was given to the jury. It was too late.").

Although the deputy did not discuss an implied consent form or the implied consent procedures, he unequivocally testified that Gridley refused the urine test. His refusal triggered application of the following statute: "If a person refuses to submit to a chemical test, proof of refusal is admissible in any civil or criminal action or proceeding arising out of acts alleged to have been committed while the person was operating a motor vehicle in violation of section 321J.2 or 321J.2A." Iowa Code § 321J.16. In light of the deputy's testimony, we conclude the district court did not err in giving the jury instruction.

## IV.    *Motion for New Trial*

Gridley moved for a new trial and for arrest of judgment. His new trial motion cited the pertinent rule but not the pertinent standard for application of the rule. *See* Iowa R. Crim. P. 2.24(2)(b)(6) (allowing court to grant a new trial "[w]hen the verdict is contrary to law or evidence"); *State v. Ellis*, 578 N.W.2d 655, 658-59 (Iowa 1998) (noting distinction between sufficiency-of-the-evidence standard and weight-of-the-evidence standard and holding "'contrary to . . . the evidence' in rule [2.24](2)(b)(6) means 'contrary to the weight of the evidence'"). The district court used the sufficiency-of-the-evidence standard to deny Gridley's motion.

Gridley contends the "district court appl[ied] an incorrect standard in overruling [his] motion [for new trial.]" The State responds that Gridley's new trial

motion made "no reference to any witness or testimony that was somehow not credible, nor the word 'weight.'"

In *Maxwell*, the court found that the defendant "clearly raised the issue of whether the verdict was contrary to the weight of the evidence by citing rule 2.24(2)(b)(6) in his motion." 743 N.W.2d at 193. Gridley's motion similarly cited the rule. Although Gridley subsequently referred to the sufficiency-of-the-evidence rather than the weight-of-the evidence standard, *Ellis* required application of the weight-of-the-evidence standard. 578 N.W.2d at 658-59. Because this standard was not applied, we affirm the convictions, but reverse the ruling on Gridley's motion for new trial and "remand the case to the district court to rule on the motion for new trial under the correct weight-of-the-evidence standard." *See State v. Nitcher*, 720 N.W.2d 547, 560 (Iowa 2006).

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**