# IN THE COURT OF APPEALS OF IOWA

No. 24-1217
Filed October 30, 2024

**IN THE INTEREST OF R.S., Jr. and A.S.,**
**Minor Children,**

**R.S., Father,**
        Appellant,

**A.C., Mother,**
        Appellant.

_____

Appeal from the Iowa District Court for Pottawattamie County, Charles D. Fagan, Judge.

The mother and father separately appeal termination of their parental rights to two children. **AFFIRMED ON BOTH APPEALS.**

Norman L. Springer of McGinn, Springer & Noethe, P.L.C., Council Bluffs, for appellant father.

Sara E. Benson of Meldrum & Benson Law, P.C., Council Bluffs, for appellant mother.

Brenna Bird, Attorney General, and Tamara Knight, Assistant Attorney General, for appellee State.

Roberta J. Megel, Public Defender's Office, Council Bluffs, attorney and guardian ad litem for minor children.

Considered by Schumacher, P.J., and Buller and Langholz, JJ.

**BULLER, Judge.**

The mother and father separately appeal termination of their parental rights to A.S. (born 2016) and R.S. (born 2018). After considering the claims in their respective appeals, we affirm termination of both parents' rights to these children.

## I.     Background Facts and Proceedings

The mother has a history of involvement with the Iowa Department of Health and Human Services (HHS), starting with 2013 reports she abused and neglected her four older children; her rights to three children were terminated in 2016. This family came to the attention of HHS again in December 2022 with reports R.S. had bruising on his ears, back, and buttocks. The child told elementary-school staff he didn't want to change his pants after having an accident because his mother "was going to whoop his ass." The same staff member saw the mother smack R.S. across the face and tell him to "shut the fuck up" when she picked him up from school.

The children were interviewed at a child protection center, where they described how the mother and father hit them with belts. A.S. said the parents frequently hit her with a belt on her "bottom." R.S. also said both parents spanked him with a belt and said they hit him on his "ass," "wee-wee" (penis), and other body parts. R.S. made similar but more limited disclosures to the school nurse and an HHS worker. And the child protection center's medical provider found R.S. had injuries consistent with being hit with a belt.

When interviewed by HHS, the father denied using physical discipline against the children while they were in his care on weekends, and he claimed to

have no knowledge of the mother abusing the children. The mother similarly denied abusing the children.

HHS founded the reports of the mother abusing both children, and they were removed from the parents. HHS was granted custody, and the children were placed in foster care. At the time of removal, the mother and father were separated, and the father lived in Omaha. The children were subsequently adjudicated children in need of assistance. At disposition, the court ordered the children to remain in the care of the foster family and directed the parents to engage in services and receive visitation at the discretion of HHS. The mother eventually pled guilty to one count of child endangerment causing bodily injury, an aggravated misdemeanor in violation of Iowa Code section 726.6(1)(a) and (7) (2023) for physically abusing the children, and she was placed on probation.

Throughout these juvenile cases, the father had ongoing problems with the law in Nebraska, including stints of incarceration, and he was on as of the termination trial. During the year preceding termination, the father was also charged with possession of methamphetamine and interference with official acts in Iowa. The father participated in some form of Nebraska re-entry program or problem-solving court, but apparently got started late because he failed to appear at the beginning of the program and a warrant was issued for his arrest. The father refused or declined to participate with HHS reunification services from roughly February 2023 to March 2024, and an interstate placement home study conducted by the state of Nebraska was not approved based on his lack of relationship with the children and ongoing criminal charges. A parenting assessment the month of

the termination trial recommended that the children remain in HHS custody and the father only receive visitation at HHS discretion.

In his trial testimony, the father expressed regret he had not made more efforts on visitation calls with the children and said he was willing to follow all recommendations in the parenting assessment once he was finished with probation and his legal troubles and could move back to Iowa. The father maintained he would complete his probation the next month, but the court-appointed special advocate (CASA) reviewed the probation agreement and did not believe this to be correct. The CASA followed up with the Nebraska probation officer, who said the father's probation would run "through 2025" and was not ending in 2024.

The mother had some ups and downs over the life of the cases but had been on a consistent downward trajectory by the time of the termination trial. She was permitted fully supervised visits with the children but did not consistently attend and generally did not take advantage of additional visits despite the opportunity to do so. The mother also declined nightly calls with the children, even though the foster parents were willing to facilitate. And she had problems with drug use: she tested positive twice for controlled substances (methamphetamine and amphetamine), she failed to appear for thirteen out of thirty-five drug tests, and three tests were tampered with or never returned. A drug screen the month before the termination trial and one in March required by terms of the mother's probation were both positive for methamphetamine. The mother claimed the test was "fake." A substance-abuse evaluation for the mother indicated she was at "moderate risk of relapse" and the initial diagnostic impression was that that she had "severe

methamphetamine use disorder—in sustained remission." Notably, use of illegal substances was also an issue in the termination of the mother's rights to her older children in 2016, and the mother described a long history of substance abuse to providers and admitted it affected her parenting. In addition to these specific problems, the mother was also generally nonresponsive or uncooperative with HHS reunification services, the CASA, and the children's guardian ad litem (GAL).

The HHS worker expressed concerns about the mother's dishonesty throughout the case, including false statements about her employment, her whereabouts, and why she missed phone calls and visits with the children. Although the full criminal records are not part of the record before us on appeal, it also appears the mother faced multiple probation violations on the child endangerment charge by failing to submit to drug testing, testing positive for methamphetamine when she did test, and failing to maintain communication with her probation officer. By the time of the termination trial, the probation officer had moved the mother to the "high-risk unit" because she was "racking up violations."

Both children have shown significant trauma behaviors while in foster care that tend to corroborate their accounts of abuse at the hands of the mother and father. One of the children engages in self-harm behaviors and says, "I'm stupid, I'm bad, I don't listen." The other has significant problems with toileting, acts out with violence, and has night terrors. The foster parents have observed that these maladaptive behaviors tended to worsen after contact with the parents. More recently, the children have stopped asking when they will see the mother next and have at times expressed fear regarding both parents. And the CASA observed the mother to be disengaged or absent from recent visits. In the HHS worker's view,

the children had bonded well with the foster parents in a pre-adoptive home, called the foster parents "mom" and "dad," and were doing reasonably well all things considered. Educators' reports to the CASA also reflected that the children were generally doing well in school.

As of the termination trial, the children had been out of the parents' custody for eighteen of the last twenty-two months. The father had not had a visit with the children for more than a year and had only recently engaged with phone calls. The mother evaded service by the sheriff's office so persistently that she was served notice of the termination by publication. The mother declined to testify at the termination trial and instead had her attorney submit a letter from her as an exhibit; it was received subject to the weight it deserves, given the attorneys' concern about not being able to cross-examine.

The county attorney, HHS, the children's GAL, and the CASA all recommended termination of both parents' rights to R.S. and A.S. Following the termination trial, the juvenile court made findings that "[t]he family has been ordered to do various services" but "the parents have not engaged in or complied with the services offered." And the court found the parents had made "little improvement towards reunification." In weighing the credibility of the father's testimony, the court found no realistic prospect of reunification in a timely fashion. And the court concluded the father "has no bond with these children," failed to engage with services for more than a year, and "chose to focus on himself and did not even do that in a timely fashion." Although the juvenile court recognized the mother had occasional "periods of follow through as she indicate[d] in her letter," the court found "they never last." The court also found the mother "consistently

lied" to HHS and providers throughout the case, and "continue[d] to blame, make excuses, and deflect onto others indicating no behavioral indicator of change."

The court ultimately terminated both parents' rights to the children under Iowa Code section 232.116(1)(e), (f), and (*l*). Both parents appeal, and we review de novo. *See In re W.M.*, 957 N.W.2d 305, 312 (Iowa 2021). Because the termination of each parent's rights is a factually and legally separate adjudication, we address their claims separately (noting overlap where appropriate). *See In re J.H.*, 952 N.W.2d 157, 171 (Iowa 2020).

## II. The Mother's Claims

The mother challenges the statutory elements of termination, the children's best interests, and whether HHS provided reasonable efforts. We order the mother's claims differently than her petition to eliminate confusion or conflation of issues, but we nonetheless address every legal claim we can discern.

First, as to the statutory elements, when the juvenile court relies on more than one statutory ground for termination, we may affirm on any of the grounds supported by the record. *In re A.B.*, 815 N.W.2d 764, 774 (Iowa 2012). We focus on 232.116(1)(f) here. The mother only challenges the fourth element, concerning whether the children could be immediately and safely returned to her custody and care as of the termination trial. *See In re A.M.,* 843 N.W.2d 100, 111 (Iowa 2014). Given the juvenile court's advantaged position to assess credibility and history with this case, we defer to the court's assessment of the mother's truthfulness and its findings that she "consistently lied" to HHS, the CASA, and the social-services providers "throughout the case." On the merits, we agree with the juvenile court's conclusion that the mother had not materially remedied any of the deficits leading

to removal and that she continued to "deflect" and "blame everyone" but herself for the case's progression. Like the juvenile court, we are troubled by the mother's history of physically abusing the children, lack of engagement with services, and recent substance-abuse history. We note the mother's failure to progress past supervised visitation as of the termination trial weighs against her ability to take immediate custody of the children. *Cf. In re L.H.*, ___ N.W.3d ___, ___, 2024 WL 3887255, at *1 (Iowa 2024) ("[The parent] never progressed beyond fully-supervised visits, which also prevented an immediate return of custody."). We therefore affirm the juvenile court's finding the children could not be returned to the mother's custody.

Second, as to best interests, we give primary weight "to the child[ren]'s safety, to the best placement for furthering the long-term nurturing and growth of the child[ren], and to the physical, mental, and emotional condition and needs of the child[ren]." Iowa Code § 232.116(2). We agree with the juvenile court that termination is in the children's best interests. The mother's inconsistent engagement with services and visits had a significant negative effect on the children, and the record evidence supports that they are doing better—physically, mentally, and emotionally—in foster care than in the parents' care. We also agree with the juvenile court that "[p]ermanency for these children is overdue" and returning them to the mother's custody would pose clear risks of adjudicatory harm. We affirm on this issue.

Last, as to reasonable efforts, we find the issue not preserved for our review. We acknowledge the State did not contest error preservation in its response on appeal. But we have an independent obligation to address error

preservation, as it is a limitation on our power as an appellate court to correct errors at law—not just a limitation on the issues a party may raise. *See Top of Iowa Coop. v. Sime Farms, Inc.*, 608 N.W.2d 454, 470 (Iowa 2000); *see also* Iowa Code § 602.5103(1); *State v. Gomez Medina*, 7 N.W.3d 350, 355 (Iowa 2024) ("If an issue was never presented to the district court to rule on, and if the district court did not in fact rule on it, we lack any 'error' to correct."). In our review of the record, we have found no motion by the mother requesting reasonable efforts nor any timely identification of specific additional services that she believes would have changed the course of this case. We therefore have no ruling to review and cannot reach the issue. *See In re C.B.*, 611 N.W.2d 489, 493–94 (Iowa 2000) ("We have repeatedly emphasized the importance for a parent to object to services early in the process so appropriate changes can be made."). But we also observe that, if the issue had been preserved, it still would provide no basis for relief: the only allegedly deficient service the mother identifies on appeal concerns visits, and the mother missed numerous in-person visits and phone calls through her own actions—not because of HHS. We would not set aside the termination even if the issue had been properly and promptly drawn to the attention of the juvenile court.

### III.    The Father's Claim

The father only challenges the statutory elements. Like with the mother, we focus on section 232.116(1)(f), and the father (also like the mother) confines his challenge to whether the children could be safely returned to his custody at the time of trial. *See A.M.*, 843 N.W.2d at 111. Much of the analysis pertaining to the mother also applies to the father, though we recognize the substance-abuse and physical-abuse concerns are somewhat less in the father's case. But this is more

than outweighed by the father's extended failure to engage with services or visitation with the children; his inability to presently care for the children due to his criminal charges, probation status, and lack of approved housing; and his minimal relationship with the children. While we can hope the father will someday end his involvement with the criminal justice system and become a suitable parent, "[c]hildren are not equipped with pause buttons, and denying a child permanency in favor of a parent is contrary to the child's best interests." *In re M.D.*, No. 18-1659, 2019 WL 479142, at *1 (Iowa Ct. App. Feb. 6, 2019). We conclude the evidence supports termination of the father's parental rights.

**AFFIRMED ON BOTH APPEALS.**